# THE MARYLAND STEEL COMPANY OF SPARROWS POINT *vs.* JOHN MARNEY.

*Contributory    Negligence—Incurring    Danger    to    Save
    another's    Life—Proximate    and    Remote    Cause—
    Master    and    Servant—Negligence    of    Fellow-servant
    known to be    Incompetent—Evidence.*

When, an employee, who is known by the employer to be incompetent, does a negligent act which imperils the lives of persons present, a fellow servant who endeavors to avert the consequences of this negligence by an act which is dangerous but not reckless, is not precluded on the ground of contributory negligence from recovering damages for injury suffered in consequence of his interposition.

The predominating cause in the production of an injury is to be regarded as the proximate cause, although there may be subordinate and dependent causes co-operating to the same end.

When a man is injured while seeking, with reasonable care, to save the life of another put in danger by defendant's negligence, the proximate cause of the injury is the defendant's negligence and not his own interference.

In defendant's foundry the molten, metal was drawn from a hole in a cupola which was stopped with clay by a tapper, whose business it was to open and close the orifice. Plaintiff's duty was to feed the cupola and his position was on a platform above the hole. On the day of the accident the regular tapper was absent and his place was taken by a person, who was known by defendant to be incompetent. After drawing out metal he closed the hole in the cupola so unskilfully that the molten metal began to ooze out, and this, if continued, would result in serious injury to the workmen in front of the cupola. Plaintiff, who was an experienced tapper, was called by the foreman and others, and rushing forward with clay on the end of a stick was about to apply it to the tap hole when the liquid metal burst over

the stopper and striking plaintiff, burned him severely and destroyed his eyesight. In an action to recover damages, *Held:*

1. That the defendant is liable for injuries caused by the negligence of the tapper since the evidence establishes defendant's knowledge of his incompetency.

2. That the direct and proximate cause of the injury to the plaintiff was the negligence of the tapper and not plaintiff's interference in endeavoring to avert the consequences of this negligence.

3. That although the plaintiff voluntarily left a position of safety and exposed himself to danger, he was not, under these circumstances chargeable with contributory negligence unless he was guilty of gross negligence in the mode of his interposition.

In the above case evidence is admissible to show the danger which would have resulted in allowing the liquid metal to escape from the cupola.

Appeal from the Court of Common Pleas (HARLAN, C. J.). At the trial the following prayers were offered:

*Plaintiff's 2d Prayer.*—If the jury find from the evidence in this case that on the 16th day of September, 1895, the plaintiff, John Marney, was, and for some months prior thereto had been, in the employ of the Maryland Steel Company, the defendant, as cupola tender in one of its foundries at Sparrows Point; that the said defendant owned and operated a large establishment and plant at that place for the manufacture of iron and steel, divided into various departments, such as the marine department, the machine shop and foundry, in which various departments were employed a large number of men; that in the foundry in which plaintiff was employed there were three large cupolas in which the iron was melted; that in each of said cupolas there were tap holes with spouts at about a height of about five feet from the floor of the foundry, from which tap holes and spouts the melted iron was drawn from the cupola when needed; that it was necessary to have various employees

to attend to said cupolas, whose duty it was when occasion required to draw off said melted iron through said tap holes and spouts, and when a sufficient amount had been drawn off to stop the flow of said iron through said tap holes and spouts by putting in a stopper of clay as described by the plaintiff in his testimony; and if they find that the escape of said melted iron through said tap holes and spouts could be readily stopped entirely, provided the said tap holes were properly stopped, and that the proper stoppage of said tap holes so as to prevent any leakage was done by a competent cupola tapper; that on the day above referred to, that is to say the 16th day of September, 1895, one of these cupolas was being attended by a man named Felix, one of the defendant's employees; that said Felix did not properly perform the work of stopping the flow of said melted iron through said tap hole, but did it in such a negligent and improper manner as to cause the same to leak, and to give rise to the imminent danger that the molten metal in said cupola would press out through the said spout and fly over a number of men who were working in the neighborhood of said cupola at the time; and if they find that the said condition of the tap hole was suddenly called to the attention of the plaintiff by an exclamation of one of his fellow-workmen, and that the plaintiff being suddenly called upon, seeing the condition of the said tap hole, and fearing that if it were not properly secured the metal would press forth and injure the men in the neighborhood as aforesaid, seized a bot stick usually employed for that purpose, put a quantity of clay upon the end of it in the usual manner, and hastened to the spout for the purpose of stopping said tap hole; that just as he was in the act of pressing said clay into the tap hole for that purpose, he saw that the melted iron was beginning to flow over the top of the clay and fearing an explosion from the contact of the molten metal with the clay on his bot stick tried to shut his eyes in time but did not succeed, and that the said metal falling upon said clay exploded and splashed into his eyes destroying his sight and otherwise injuring him, as testified to by

him and by his daughter, Mrs. Gilman; and that if they find that thus attempting to close said tap hole the plaintiff was employing the methods usually employed for that purpose, and exercising such care as a reasonably prudent man could be expected to exercise under such circumstances; and if they further find that the said Felix had been employed at said foundry for several years prior to said accident; that several months prior thereto he had been employed at the said work of a cupola tender, but had been found to be incompetent, by reason of timidity and nervousness, for said work, and had been twice burned as the result of his incompetency; that this fact had become known to the witness Hines, who was at the time of this accident the superintendent of the said foundry, clothed with the power and charged with the duty of employing and discharging, at his discretion, all the men needed for the work of said foundry, including cupola tenders, and by reason of his said incompetency the said foreman had taken him away from his work of attending the cupolas and put him at other labor, but that on the day of said accident he put him at the work of attending this cupola again, notwithstanding his knowledge of his unfitness for the same; that in the early part of the afternoon, some hours prior to the accident complained of, the said Felix had again shown his unfitness for said work of stopping said tap holes in said cupola in the presence of the said foreman, and also of Mr. Sahlin, the superintendent of the Maryland Steel Company at Sparrows Point, who had entire charge of all the various departments of the company there, and the power to employ and discharge the foremen of the various departments, including the foundry; and that Mr. Sahlin, as well as said Hines, thus had knowledge of the said Felix's unfitness for said work, but nevertheless allowed him to continue at the same until the accident complained of in this case occurred; and if they find that the said foreman, Hines, himself had no knowledge of the proper method of attending cupolas, and especially of stopping the tap holes of the same, then the plaintiff is entitled to recover in this case

and their verdict should be for the plaintiff.—(*Granted.*)

*Plaintiff's 3d Prayer.*—If the jury find for the plaintiff in this case under the plaintiff's first prayer, in estimating the damages they are entitled to take into consideration the plaintiff's state of health and physical condition prior to the accident, his capacity for doing work and earning wages prior thereto, as compared with his condition and capacity since the accident in consequence thereof; and they may also consider the question as to whether the injuries will be permanent in their effect, and they may also consider the physical and mental anguish which the plaintiff has suffered in the past, or is likely to continue to suffer in the future, and award him such sum as in their judgment will be an adequate compensation for the injuries which he has sustained.—(*Granted.*)

*Defendant's 1st Prayer.*—That there is no evidence in the case of any such negligence on the part of the defendant in discharge of its legal obligations to the plaintiff as would entitle him to recover in this action.—(*Refused.*)

*Defendant's 2d Prayer.*—That the undisputed evidence in the case shows that the injury was caused by the negligence of the plaintiff himself, and the verdict must be for the defendant.—(*Refused.*)

*Defendant's 3d Prayer.*—That the plaintiff, by voluntarily and unnecessarily placing himself in the position in which he was when he received the injuries for which he seeks to recover, was guilty of contributory negligence, and the verdict must be for the defendant.—(*Refused.*)

*Defendant's 4th Prayer.*—That there is no evidence that it was necessary or proper for the plaintiff to be in the position in which he could be injured by the molten iron which exploded upon the day he was injured, and that he is not entitled to recover under the pleadings in this case.—(*Refused.*)

*Defendant's 5th Prayer.*—That even if the jury believe that the plaintiff was injured by reason of negligence or want of skill of the cupola tender, and that defendant was guilty of negligence in appointing said cupola ten-

der, or retaining him in its service, the plaintiff is not entitled to recover if the jury believe he would not have been injured except for want of ordinary care and prudence on his part.—(*Granted.*)

*Defendant's 6th Prayer.*—That the undisputed evidence in the case shows that the plaintiff had knowledge of the incompetency of the man called Felix Smith, in neglecting to close the bot hole of the cupola, and that he undertook to close said bot hole at his own risk, and the verdict must be for the defendant.—(*Refused.*)

*Defendant's 7th Prayer.*—If the jury believe from the evidence that the explosion by which plaintiff was injured was caused by the plaintiff thrusting a wet bot stick into the molten metal, and that he knew it was dangerous to thrust said wet bot stick into the metal, if they so find, then they should give a verdict for the defendant.—(*Granted.*)

The jury rendered a verdict for the plaintiff for $15,000.

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD and PEARCE, JJ.

*J. Alexander Preston* and *Alex. Preston* (with whom was *Robt. Ludlow Preston* on the brief), for the appellant.

*William L. Marbury* (with whom was *C. W. Kohlmann* and *C. Bohn Slingluff* on the brief), for the appellee.

PEARCE, J., delivered the opinion of the Court.

This is an action to recover damages for injuries alleged to have been sustained by the plaintiff, John Marney, through the negligence of the defendant, the Maryland Steel Company of Sparrows Point. The appellant is a body corporate, engaged in the manufacture of iron and steel, and it owns and operates a large establishment and plant for that purpose located at Sparrows Point in Baltimore county. On the 16th of September, 1895, the plaintiff was in the service of the defendant company, being employed in the foundry where iron castings

were made, his special duties being to charge the furnace or cupola with metal and to see that a proper supply of molten metal was ready for the moulder whenever required.   The molten metal is drawn from the cupola through an orifice, called a tap hole, near the base of the cupola and about five feet from the ground.   This orifice is from three quarters of an inch to an inch in diameter and is closed with clay, which forms an effective plug or stopper to retain the liquid metal.   When a flow of metal is required the tap hole is opened by means of a tap bar, which is a clean, sharp iron rod or bar, which is driven through the clay stopper into the tap hole, thus opening the orifice and permitting the liquid metal to flow.   When it is desired to stop the flow of metal, it is done by means of an implement called the *bot stick*.   This is a round iron rod or bar with a wooden handle, the whole being about three and a half feet in length with a flat disc on the end from an inch and a quarter to an inch and a half in diameter.   A piece of damp clay is placed on this disc, and is moulded by hand into the shape of a cone, completely covering the face of the disc.   This stick, with the conical clay stopper upon the end, is driven through the stream of metal into the tap hole, and by a quick turn of the hand and arm the bot stick is withdrawn, leaving the clay stopper in the tap hole, thus closing the orifice until it is tapped for another flow of metal. · It is needless to say that the safety of a tapper and of his fellow-servants, whose duties bring them within range of the stream of liquid metal which he controls, requires that he should possess courage, coolness and skill in his business.   The undisputed testimony was that the plaintiff had been a cupola tender for many years and was an expert in charging and tapping them; that he had been accustomed to the use of the bot stick since 1868, and was considered very skilful in that particular business; the foreman of the foundry department testifying that the foreman of the shops, who employed all the men in the foundry, brought Marney there, " as an experienced cupola man, *being such an extraordinary good hand at that work.*"   But

his duties in charging the cupola precluded his also
performing the regular duties of tapper, and a regular
tapper was employed by the defendant company, who
was presumably a competent and skilful man, but who
was absent on the day of the accident attending a fun-
eral, and his place was supplied by a man who was
known by the defendant to be both unskilful and in-
competent.   The accident occurred in the following
manner: The cupola was charged from a platform sup-
ported by a scaffold twenty feet above the ground and
reached by a stairway.   The plaintiff came down the
stairs to ask how much metal was required for the next
draft, and being informed, stopped and looked at the
man who was then tapping at the east tap hole of the
cupola, there being another tap hole in the south side
of the cupola.   He says, " I seen there was a little some-
thing the matter with him and I jumped up (on the
elevation made for the purpose) and stopped her in—
and then I went up stairs."   Sometime after this a work-
man, one Geo. Struckler, since dead, called out, " John,
O Marney, this is leaking over here," and a moment
later, Doyle, who was foreman of the laborers—and in
a position of authority over all of them—called, " Jack,
she is getting away on this (the south) side "; where-
upon plaintiff sprang down the stairs, seized a bot stick
and a piece of clay, put it on the bot stick and just as
he was about to apply it to the tap hole, the metal, which
was oozing out, burst over the stopper then in the tap
hole, flew up and struck him on the body, and in the
face and eyes, causing intense agony for several months
and absolutely and permanently destroying the sight of
both eyes.   Plaintiff testified that he was in no danger
himself when called; that he could in two steps have
gotten behind the furnace, which would have saved
him, but that there was a common gangway in front of
the tap hole and a number of men were working in
front of it; that he knew the danger to all these men if
the iron, which was then oozing out, should burst
through the defective stopper and fall upon the hard
floor, and that he went there to save the life of the men

around there.   This testimony was not disputed, nor was the incompetency of the temporary tapper denied, though it was claimed that this incompetency was as well known to the plaintiff as to the defendant, and it was contended that the plaintiff's injury was caused by the negligent and reckless manner in which he attempted to stop the leaking tap hole, and that but for this negligence on his part no accident would have occurred. This defence was properly submitted to the jury by the defendant's fifth and seventh prayers which were granted, but the jury rendered a verdict for the plaintiff for fifteen thousand dollars, and from the judgment thereon this appeal was taken.   It was also contended at the trial below that as the plaintiff, by his own admission, voluntarily left a position of safety and exposed himself to peril, that he was thus guilty of contributory negligence which must defeat his recovery.

Three exceptions were taken by the defendant in the course of the trial.   During the examination of the plaintiff as a witness his counsel asked him the following question:  " State whether or not there is any danger of injury to people standing or working in the neighborhood of a tap hole to be feared from the molten metal being allowed to escape or to continue to escape the way you say it was when you went there to stop it? " Defendant objected to this question but the Court overruled the objection and permitted the question to be asked, and the witness answered:  " There was such danger from the simple fact that as soon as molten iron runs down any stick or hard surface, or anything that is damp, it wont stay there and it's going to fly; it would have went 20 feet and burnt the people around there, and there was not a man, if it had occurred, that would have escaped out of that corner without being burned, because it would come like a shower of hail right on top of them.   It would strike the hard surface and then fly all over the shop.   Every man in the radius of 20 feet would get it, because it don't give any notice when it is coming.   It comes in a hurry!   I have seen too much of it."

To the action of the Court in overruling the objection to this question and in permitting the answer to be received in evidence, the defendant objected, and this constitutes its first exception.  The second and third exceptions were taken to the rulings on the prayers, which will be set out in the Reporter's statement of the case.  The defendant's first and second prayers were offered at the close of plaintiff's testimony, and their rejection at that stage of the case constitutes its second exception.  These prayers were renewed, with five other prayers, at the close of all the testimony, and the plaintiff also offered two prayers.  The Court granted the plaintiff's prayers and also granted the defendant's fifth and seventh prayers, and rejected its first, second, third, fourth and sixth prayers, and overruled a special exception taken by the defendant to the plaintiff's first prayer on the ground that there was no evidence to sustain it, and the defendant's third exception was taken to the granting of plaintiff's prayers, to the rejection of its own first, second, fourth and sixth prayers, and to the overruling of its special exception to plaintiff's first prayer.

The general principles of law upon the application of which this case must depend are well established, but there is involved one question which has never been passed upon by this Court, namely, whether one who voluntarily incurs peril caused by the negligence of another, in order to save the life of one imperilled by the same negligence, is debarred from recovery upon the ground of his own contributory negligence.   This question is an interesting one and has received intelligent and thoughtful consideration in the decisions of other tribunals, by the aid of which we think it will not be difficult to reach a correct conclusion upon the facts of this case.  The evidence shows that the temporary tapper, Felix, and the plaintiff, Marney, were fellow-servants of the same master, the Maryland Steel Company; that Thomas G. Doyle was foreman of the laborers and riggers in the foundry department; that John P. Hines was foreman of the shop, *employed all the men in the*

*shop, and had charge of everybody around the foundry,* and that Mr. Sahlin was the superintendent of the Maryland Steel Company and " was boss over all the bosses and men in the works." In all cases where the relation of master and servant is created by a mere agreement that the servant is to labor for the master at a certain rate of compensation, there arise by implication certain reciprocal rights and obligations on the part of each, which the law recognizes as fully as if expressed in the agreement. Bailey, in his work on the master's liability for injuries to the servant, states the chief of these implied obligations as follows: 1st, that he will provide suitable means and appliances to enable the servant to do his work as safely as the hazards incident to his employment will permit; 2nd, that he will provide a suitable and reasonably safe place for the doing of the work to be performed by the servant; and 3rd, that he will provide, when required by the nature of the work, other servants reasonably skilful and competent for the performance of their particular work, so that the servant may not be exposed to unnecessary risk or peril from unskilful or incompetent fellow-servants. In the performance of these and all other similar duties the master is not a guarantor against the negligence of his servants, and is bound only to the exercise of reasonable and ordinary care. Every servant entering into the employment of a master takes upon himself the risk of injury from the negligence of his fellow-servants, and for such negligence the master cannot be held liable, unless he himself has been guilty of negligence in the selection of the servant whose carelessness caused the accident, or unless, knowing his incompetency, or having sufficient opportunity to know it and failing to discover it, he has retained the negligent employee in his service. *Mayor of Balto.* v. *War,* 77 Md. 597.

And in this case, as in the case just cited, the declaration is framed upon a distinct recognition of these undisputed principles. In order therefore to recover for the terrible injuries which the plaintiff has received in the service of the defendant, it is necessary for him to

establish by legally sufficient evidence, first, that the accident was the direct result of the negligence or incompetency of the tapper, Felix; secondly, that the defendant, prior to the employment of Felix as tapper on that special occasion, had knowledge of his incompetency, or that after his employment and before the accident the defendant discovered his incompetency but nevertheless retained the incompetent servant; and thirdly, it must not appear from the evidence that he has himself been guilty of any negligence directly contributing to produce his injuries.

The evidence of the gross incompetency of Felix as a tapper, as well as the full knowledge by the defendant of such incompetency, before his employment on the day of the accident, and of its demonstration anew to the defendant on that day and before the accident, is undisputed and overwhelming.   Johnson, one of the moulders employed by defendant, testified that he had known Felix over a year; " that he appeared to be of a very nervous disposition at that character of work, and judging from my knowledge of the foundry I should not judge him to be a man competent for the position; he wasn't acquainted with the principles I have seen experienced men adopt for that character of work"; and again he says, " if he is timid of the hot iron, he is fearful of doing his duty; he wants to get away from it as soon as he can, and if he is an incompetent man he will leave it whether it is secured or not, because he is not aware of the fact."

Hines, another moulder by trade who had been with the Maryland Steel Company five or six years and who was foreman of the shop at the time of the accident, testified that Felix had been previously employed there as a tapper but had got burnt a couple of times, " that he was afraid to tap—afraid he would burn himself and the other men; he would run away and let it go if it got the best of him—that the men around the cupola said he could not do the work right, so I took him away and put another man in his place—*he was not competent*, but I had to put him there this day because the regular

cupola man was off at a funeral." He also testified that Mr. Sahlin, the general superintendent, saw Felix tapping nearly every day when first employed and saw him running away when the iron bounced over the top of the runner, and that Sahlin told him to put another man in his place, and he did so; that on the day of and before the accident Sahlin was standing in front of the cupola while Felix was tapping, and said, "this man will burn himself and the other men," but did not say anything about turning him off. He also testified that Sahlin knew he, Hines, knew nothing of tapping but that Sahlin insisted upon his taking the position of foreman, and charged him with the duty of employing the men for all the work though he objected to doing so, and only took it temporarily till they could get some one else. It does not appear that Marney knew before the accident of the incompetency of Felix, but he testified that he observed him tapping on that day and "seeing there was a little something the matter with him," he stopped the tap hole for him at that time. He also testified that the stopper, which was leaking when he was injured, was a very light and insecure one, and that it is the duty of a man when he leaves it for any considerable length of time (as it was shown Felix did on that occasion) to secure it, and that it was criminal to leave a stopper that way, because that was a gangway with men working all round there.

These extracts from the testimony establish beyond all question the gross incompetency of Felix for his work, and the full and continuous knowledge of this incompetency by the defendant, thus charging it with flagrant negligence in his selection for such work. But it still remains to be shown that the accident was the direct result of the incompetency of Felix, and of this we have no doubt, though it was strenuously contended by the appellant's counsel that the cause of the accident was not the negligence of defendant in supplying an incompetent fellow-workman nor the negligence of Felix in not properly securing the tap hole, but that it was the action of Marney himself in attempting to pre-

vent the consequences of the negligence of Felix, by stopping the tap hole himself; and this requires some consideration of the doctrine of proximate and remote cause. In discussing this subject, Mr. Bailey, in his work already referred to, says on page 418: " It is perhaps well to call attention to the fact that proximate cause does not mean the direct cause in point of time, but may mean the nearest by relation; that remote cause does not mean remote in point of time but merely in its connection with the primary cause. To illustrate: a farmer along the line of a railroad may open the fence maintained by the company for temporary purposes, and while so left open his cattle may stray upon the company's track and receive injury by coming in contact with the company's trains, without any fault being chargeable to its servants in charge. The direct cause of such injury would be the collision. The remote cause in point of time would be the act of the farmer in leaving the fence open. The remote cause in point of time becomes the proximate cause in producing the injury. *We go back of the direct cause to find a negligent act which made the collision and injury probable, without which the accident and injury would not have occurred, and we charge such an act with the responsibility for the injury.*" This method of reasoning is in harmony with that of this Court in *Balt. & Pot. R. R.* v. *Reaney,* 42 Md. 136, where JUDGE ALVEY says: " In the application of the maxim, *In jure non remota causa sed proxima spectatur,* there is always more or less difficulty and attempts are frequently made to introduce refinements that would not consist with principles of rational justice. Courts do not indulge in refinements and subtleties as to causation *that would* defeat the claims of natural justice. They rather adopt the practical rule, that the *efficient and predominating cause* in producing a given event or effect, though there may be subordinate and dependent causes in operation, must be looked to in determining the rights and liabilities of the parties concerned. It is certainly true, that where two or more *independent* causes concur in producing an effect, and it cannot be determined

which was the efficient and controlling cause, or whether without the concurrence of both the event would have happened at all, and a particular party is responsible for only the consequences of one of such causes, in such case a recovery cannot be had, because it cannot be judicially determined that the damage would have been done without such concurrence. But it is equally true, that no wrong-doer ought to be allowed to apportion or qualify his own wrong; and that as a loss has actually happened, whilst his own wrongful act was in force and operation, he ought not to be permitted to set up as a defence that there was a more immediate cause of the loss, if that cause was put into operation by his own wrongful act. To entitle such party to exemption, he must show not only that the same loss *might* have happened but that it *must* have happened, if the act complained of had not been done. The principle is well settled that whoever does a wrongful act is answerable for all the consequences that may ensue in the ordinary and natural course of events, though such consequences be immediately and directly brought about by intervening causes, if those intervening causes were set in motion by the original wrong-doer."

The case of *Gibney* v. *The State*, 137 N. Y. 1, is a recent practical application of the principles stated in the 42 Md. Plaintiff, with her husband and infant son, were crossing a bridge over the Erie Canal; the child fell through an opening in the railing of the bridge which was left unguarded into the canal; the father plunged into the canal to rescue the child and both were drowned. It was held " that while the immediate cause of the peril to which the father naturally and instinctively exposed himself was the peril of the child, the cause of the peril in both cases might be attributed to the culpable negligence of the State in leaving the bridge in a dangerous condition." The principle of these decisions seems to us to be quite decisive of the view that the negligence of Felix was the proximate and efficient cause of the accident which produced the plaintiff's injuries. Adopting the reasoning and language of Mr. Bailey

cited above, we go back of the direct cause (in this case the interposition of Marney to save life) to find a negligent act (in this case the deliberate employment by the defendant of a servant known to be grossly incompetent) which made an accident probable, without which the accident and injury would not have occurred, and we charge that act with the responsibility for the injury.

But it is further contended that even if the proximate cause is thus correctly ascertained, the plaintiff has been guilty of such concurring negligence as must defeat his recovery, and this is claimed upon two distinct grounds: first, that his leaving his position of safety even to save life was in itself fatal to his recovery; and second, that if this be not correct, the use of a wet bot stick and wet clay by an experienced tapper constituted gross negligence on his part.   There can be no doubt that actual negligence by the plaintiff in the manner of his interposition should defeat his recovery and this defence was therefore properly submitted to the jury on the testimony of Doyle and Dr. Woodward, by the defendant's fifth and seventh prayers which were granted, but the jury found by their verdict that plaintiff was free from actual negligence.   It only remains therefore to consider whether plaintiff's interposition, without actual negligence, in order to save life, constitutes negligence *per se*, and we are of opinion that it does not.   This is the doctrine of the text writers.   Pierce, in his work on Railroads, page 328, says: "The fact that the injured person did some act by which he incurred or increased danger, does not necessarily involve negligence which will prevent recovery, *where the danger was created by some wrongful act of the company.* The question is for the jury whether he acted from wrongheadedness, or as a prudent man would have done under the circumstances."   Beach, in his work on Contributory Negligence, sec. 42, speaking of the conduct of persons who are themselves exposed to sudden danger, says: "When one risks his life, or places himself in a position of great danger in an effort to save the life of another, or to protect another who is exposed to a sudden peril, or in

danger of great bodily harm, such exposure and risk
for such purpose is not negligence." It was so held in
*Eckert* v. *L. I. R. Co.*, 43 N. Y. 502, where Eckert, in the
effort to save a child from being negligently run over
by one of defendant's trains, lost his life without actual
negligence on his part; and JUDGE GROVER said: "It
was his duty to exercise his judgment as to whether he
could probably save the child without serious injury to
himself. If from the appearances he believed that he
could, it was not negligence to make an effort to do so,
although believing he might possibly fail and receive an
injury himself. The law has so high a regard for human
life that it will not impute negligence to an effort to
preserve it, unless made under such circumstances as to
constitute rashness in the judgment of prudent persons."
It was so held in Ohio, in *Pa. Co.* v. *Langendorf*, 48
Ohio St. 316, where the Reporter paraphrasing the opin-
ion of the Court, in the head note, states it thus: "In
such cases, if the rescuer does not rashly and unneces-
sarily expose himself to danger, and is injured, the injury
should be attributable to the party that negligently or
wrongfully exposed to danger the person who required
assistance." Eckert's case was recently approved in a
strong and clear opinion in *Gibney* v. *The State*, 137
N. Y. 1, and it has been followed by the Courts of last
resort in a number of the States. In *Linnehan* v. *Samp-
son*, 126 Mass. 506, where the Court said: "The law
does not require cowardice or inaction in such a state
of things, and it does not follow as matter of law that
in encountering the danger, he was necessarily guilty
of a want of due and reasonable care." So in *Pa. Co.*
v. *Roney*, 89 Ind. 453, where an engineer refused to leave
his post, and went to his death in the discharge of a
duty cast upon him. So also in *Donahoe* v. *R. R. Co.*,
83 Mo. 563; in *Condiff* v. *R. R. Co.*, 45 Kan. 260; in
*Cottrill* v. *R. R. Co.*, 47 Wis. 634, and in *Peyton* v. *Ry.
Co.*, 41 La. Ann. 862. These views are in accord with
our own. The plaintiff in this case, though moving in
an humble sphere, has given an example of genuine and
heroic manhood, and has demonstrated that in his

estimation " the duties of life are more than life." The plaintiff's first prayer requires the jury to find that the defendant knowingly employed and retained an incompetent servant; that this servant, by reason of his incompetency, brought about the sudden and imminent danger of the explosion which actually occurred; that the plaintiff interposed to avert this danger, and in so doing employed the usual and ordinary methods for that purpose and exercised such care as a reasonably prudent man could be expected to exercise under such circumstances; and there was abundant evidence to sustain the theory of the prayer. In framing it the defendant was not a " forgotten man," nor in granting it did the Court permit the plaintiff to be generous at the expense of the defendant, for the prayer required the jury to find a default on the part of the defendant which originated the danger, and continued in operation until the moment of the accident. It follows from what we have said that there was no error in granting this prayer, nor in overruling the special exception thereto, which was in any event defective in failing to specify in what respect the evidence was alleged to be insufficient to support the prayer.

The plaintiff's second prayer correctly stated the rule of damages applicable to the case. Without the evidence objected to in the first exception, the plaintiff could not have laid the foundation for his defence, and there was no error in its admission.

The defendant's first, second, third and fourth prayers are all based. upon the erroneous view that the interposition of the plaintiff under the circumstances was negligence *per se*, and they were therefore properly rejected. The fourth prayer was open to the further objection that it ignored the evidence that plaintiff was to stop the cupola when called, and that he was called by Struckler, and also by Doyle, who was his superior in authority and had the right to direct him.

The defendant's sixth prayer might be disposed of on the same ground as the others, since even if plaintiff had known of Felix's incompetency this would not make his

interposition to save life negligence *per se;* but apart from this consideration it would have been erroneous to say that the undisputed evidence showed that plaintiff had this knowledge when there was in fact no positive testimony on this point.

Finding no error in any of the rulings, the judgment will be affirmed.

> *Judgment affirmed with costs above and below.*

(Decided December 20th, 1898.)