## MARYLAND STEEL COMPANY OF SPARROWS POINT *vs.* JOHN MARNEY ET AL.

*Perjury in Trial of a Cause—Bill in Equity to Restrain Execution— Petition to Strike Out Judgment.*

A bill in equity to restrain the execution of a judgment alleged that the plaintiff therein had recovered the judgment by means of false testimony and that he had promised compensation to certain witnesses to induce them to give false evidence. After the verdict had been rendered a motion for a new trial was overruled and the judgment was affirmed on appeal. *Held*, that a Court of Equity will not under these circumstances grant relief, because otherwise there would be no end to litigation, and because the question as to the truth of the testimony so attacked was in issue at the trial and was then passed on by the jury.

An employee recovered damages in an action against his employer by proof that his injury, for which the action was brought, was caused by the incompetency of a fellow-servant, and that this was known to defendant's foreman. After the judgment in that action was affirmed on appeal and superseded, the defendant filed a bill to re-

strain its execution, alleging a conspiracy between plaintiff and other witnesses to establish his claim by perjury, and especially that the testimony of a certain witness, to the effect that defendant's foreman was present when plaintiff was injured and admitted the incompetency of the fellow-servant who caused the injury, was false. The bill alleged that the defendant in the action had only recently discovered that its foreman was not then present, but was in Europe at the time of the injury, and that defendant and its superintendents did not know of the incompetency of the fellow-servant. *Held*, that since the defendant in the action had notice that the plaintiff therein would rely upon the incompetency of the fellow-servant and the knowledge thereof by the defendant, and since the defendant had had opportunity to present at the trial the defenses now relied upon and had been unable or neglected so to do, the bill cannot be maintained.

A petition to strike out a judgment alleged that the plaintiff had been guilty, at the trial, of perjury and subornation of perjury. *Held*, that a demurrer to the petition was properly sustained because it failed to allege that the defendant had a meritorious defense, or that the judgment was unjust, or that the defendant had been injured by the perjured testimony, since the facts falsely sworn to might have been established by other evidence.

*Quære*, whether a trial Court has jurisdiction to strike out a judgment after it has been affirmed by the Court of Appeals and then superseded.

Appeal from an order of the Court of Common Pleas (WRIGHT, J.) sustaining demurrer to defendant's motion to strike out a judgment and overruling the same.

Also an appeal from a decree of the Circuit Court No. 2, of Baltimore City (SHARP, J.), sustaining demurrers to the bill of complaint of the appellant in this case, and dismissing the same.

The cause was argued before MCSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*John Prentiss Poe* and *Alexander Preston* (with whom was *J. Alexander Preston* on the brief), for the appellant.

The injury to the plaintiff was sustained on the 16th day of September, 1895. No suit was brought by him until about eighteen months thereafter. His original declaration was filed in the Circuit Court for Baltimore County (in

which Court the suit was brought), on the 20th of May, 1897. The defendant pleaded the general issue on the 24th of May, 1897. The case was removed by the defendant, and the record was sent for trial to the Court of Common Pleas. The trial began on the 10th day of May, 1898. The evidence was closed on the 11th day of May, 1898, and the verdict was rendered in favor of the plaintiff for $15,000 on the 12th day of May, 1898. A motion for a new trial was filed by the defendant on the same day, and was overruled by the Court below on the 21st day of May, 1898. An appeal was prayed on the 26th day of May, 1898. The appeal was heard at the October term, 1898, and the opinion of this Court was filed on the 20th of December, 1898. A motion for a reargument was made, but was overruled. The judgment was superseded on or about the 11th of February, 1899. Before the expiration of the six months of the *supersedeas* a petition and motion to strike out the judgment was filed on the 9th of August, 1899.

The petition sets out the facts upon which appellant relies. These are alleged to be newly discovered and vitally important facts, the clue to which was not ascertained until May, 1899, and which no reasonable diligence could have discovered in time for use at the trial or on the motion for a new trial. The petition shows that the fact that Sahlin was absent from the country when the accident occurred was not discovered by the appellant until May, 1899. Its significance was at once apparent, and careful investigation, immediately begun by the appellant, brought to light the fraud, deceit, conspiracy and surprise, now relied on as the ground of our motion.

We maintain that upon the facts stated in the petition, which must upon this appeal be accepted as true, the delay on the part of the appellant in filing its motion to strike out the judgment is amply and sufficiently accounted for. This objection to our motion is, therefore, effectually met and answered.

As to the fraud, deceit, surprise and conspiracy. The

facts are set out in the petition, and the question is whether they present a sufficient case for striking out the judgment. Felix Smith, the alleged incompetent fellow-workman, was one of the conspirators; he was in consultation with the plaintiff, and Hines and Johnson, the plaintiff's two indispensable witnesses. With Hines and Johnson, he left the service of the appellant not long after the injury to the plaintiff, and took employment along with them at Carr's foundry, where he worked as helper to Hines. His whereabouts were not discovered until *near the end of the trial, too late to get him as a witness;* and even if he could have been found and summoned, his participation in the conspiracy would in all probability have led him to swear falsely, as he had been bribed to do by the plaintiff, and as the petition says and the demurrer admits his co-conspirators did. To all practical intents and purposes, he was kept by the conspiracy from being available to the appellant as a witness, and on the strongest cases cited by the appellees, this is such a fraud on the administration of justice as should induce the Court to set aside the judgment. *United States* v. *Throckmorton*, 98 U. S. 68.

Assuming that the general rule contended for by the appellee is ordinarily correct, viz., that the fraud which will induce a Court of Equity to set aside a judgment between the same parties must be some act or acts extrinsic or collateral to the matter tried in the first Court, and not a fraud in the matter on which the judgment was entered, we respectfully submit, 1st, that this rule does not apply in its full rigor to applications like ours, made by the defrauded party to the very same Court in which the judgment was recovered; and 2nd, that here the fraud complained of *was extrinsic.* *Cotzhausen* v. *Kerting*, 29 Fed. Rep. 821; *Trefz* v. *Knickerbocker Ins. Co.*, 8 Fed. Rep. 177; *Laithe* v. *McDonald*, 7 Kan. 264; *Ross* v. *Wood*, 70 N. Y. 8.

*C. Bohn Slingluff* and *William L. Marbury* (with whom was *C. W. Kohlmann* on the brief), for the appellees.

This is an application made after the expiration of the term at which the judgment was rendered to strike out that judgment on the ground that the testimony upon which it was rendered was false, that is to say, upon the ground that the plaintiff and his witnesses perjured themselves. Now, clearly, that was the very question which was at issue at the trial. On that issue the defendant has had its day in Court, and as to that issue the judgment is absolutely conclusive. "The judgment is conclusive as to all questions of fraud or perjury which were involved in the trial itself. The competency and credibility of witnesses and the effect of their testimony is in issue in every case." *Herman on Estoppel*, sec. 394; *U. S.* v. *Throckmorton*, 98 U. S. 66; *Freeman on Judgments*, sec. 489; *Haas* v. *Billings*, 42 Minn. 63.

The fraud which consists in the procuring and producing of false or perjured testimony is not the kind of fraud for which any judgment can be set aside after the lapse of the term at which it was rendered. *Rust* v. *Lynch*, 54 Md. 649; *Anderson* v. *Graff*, 41 Md. 601; *McDougall* v. *Walling*, 58 Pac. Rep. 669.

Equity will not relieve against fraud, etc., unless practiced in the very act of obtaining the judgment, rendering a full and impartial trial impossible. *Miller* v. *Morse*, 23 Mich. 365; *U. S.* v. *Throckmorton*, 98 U. S. 566; *Vance* v. *Burbank*, 101 U. S. 514; *Riddle* v. *Baker*, 13 Cal. 295; *Pico* v. *Cohn*, 98 Cal. 129; 13 L. R. A. 336; *Friese* v. *Hummel*, 26 Oregon, 145; *U. S.* v. *Flint*, 4 Sawyer, 42; 106 U. S. 454.

It does not appear, as required by all the authorities, that the Maryland Steel Company was free from negligence; on the contrary, it appears from the face of the bill and the Record in the case that if the facts were as it now states they were, it was guilty of gross negligence in failing to prove them originally, or at least attempting to prove them at the original trial. It is certainly a well-established rule in this State "that a Court of Equity will not relieve against a recovery in a trial at law, unless the justice of the verdict

can be impeached by facts, or on other grounds, of which the party seeking the aid of chancery could not have availed himself at law, or was prevented from doing it by fraud or accident, or the act of the opposite party, unmixed with any negligence or fault on his own part." *Gott* v. *Carr*, 6 G. & J. 312; *Kirby* v. *Pascault*, 53 Md. 537.

It is well-settled law that there can be no surprise at evidence which is produced in support of the issues raised by the pleadings. *Conlon* v. *Mead*, 172 Ill. 13; *Furley* v. *Taylor*, 6 Baxter, 376; *Simpson* v. *Golden*, 114 Ala. 336; *A. & E. Ency. of Law*, vol. 16, p. 544; *R. R. Co.* v. *Sayer*, 21 App. Div. N. Y. 624; *Burr* v. *Palmer*, 23 Vt. 244.

Boyd, J., delivered the opinion of the Court.

John Marney sued the appellant for injuries sustained by him while in the employ of that company, by reason, as he alleged, of the incompetency of some of his fellow-servants and the failure of the company to provide suitable and safe machinery and appliances. The injury resulted in the loss of both of his eyes and on the 12th of May, 1898, he recovered a verdict for $15,000 in the Court of Common Pleas of Baltimore City. The company made a motion for a new trial, which was overruled, and an appeal was then taken to this Court, resulting in the affirmance of the judgment, the case being reported in 88 Md. 482. A motion for a reargument was overruled and the company then superseded the judgment for six months, which expired on the 11th of August, 1899—one-third of the judgment having been in the meantime entered to the use of C. W. Kohlman and William L. Marbury, who were the attorneys for Marney. On the 9th of August, the company made a motion in the Court of Common Pleas to strike out the judgment, and the same day filed a bill in the Circuit Court No. 2, of Baltimore City, to restrain the appellees from collecting it. Messrs. Kohlman and Marbury demurred to the petition to strike out the judgment and also to the bill of complaint, and the demurrer in each case was sustained

and the motion to strike out the judgment overruled, from which rulings these appeals were taken.

As has been held in a number of cases in this State, the power to set aside judgments upon motion for fraud, deceit, surprise or irregularity in obtaining them is a common law power incident to Courts of Record. During the term at which a judgment is rendered it remains subject to the control of the Court, but after the lapse of the term there must be the most clear and satisfactory proof of the fraud, mistake, surprise or other ground relied on, and the party seeking such relief must appear to have acted in good faith and with proper diligence. The Court exercises a general equity jurisdiction and considers all the facts and circumstances of the case. When, therefore, it is sought to vacate a judgment on the ground of fraud, the Court in which it was rendered ordinarily has as much power to entertain and act upon the application as a Court of Equity has. The main difficulty in the way of the Court of Common Pleas granting the appellant full relief, if otherwise entitled to it, that suggests itself to us, is the fact that the judgment was affirmed by this Court. The Constitution (Art. 4, sec. 15) provides that its judgments " shall be final and conclusive," and the Code authorizes a *fieri facias* or attachment to be issued on such judgment and provides for the *supersedeas* of it within two months after the rendition. It may therefore be questionable whether complete relief could be granted by the Court of Common Pleas under such circumstances, but as that question was not argued and we heard the two appeals together, it will not be necessary to do more than allude to the point, so that it may not be hereafter assumed that we conceded that the lower Court can vacate a judgment, on motion, after it has been affirmed and then superseded, as a judgment of this Court.

But, passing that by without further comment, the motion is, in our opinion, lacking in some allegations that are material and necessary to authorize a Court to set aside a judgment, irrespective of the question whether the fraud alleged

is sufficient. Marney obtained his judgment by proof that a coemployee named Schmidt was incompetent, and that, notwithstanding such incompetency was known to the defendant, it continued him in its employ, thereby causing the injury complained of. The ground upon which the motion is based is that Schmidt, P. Clinton Johnson and John P. Hines entered into a conspiracy with the plaintiff to establish his case by false testimony, for which he " was to compensate all three of said parties. Schmidt was to get one hundred dollars, Johnson was to get two hundred and fifty dollars, and Hines was also to get two hundred and fifty dollars." It alleges that the incompetency of Schmidt was sworn to by Johnson and Hines, and the knowledge of it by the defendant was attempted to be proved by Hines. The only false testimony specifically pointed out was that Hines swore that Axel Sahlin, the superintendent of the defendant company, was present September 16th, 1895, the day of the accident, saw Schmidt at work at the cupola where the accident happened, noticed his unfitness for the place and spoke to Hines about it, remarking that he would burn himself and injure some of the other employees. It then alleges that Sahlin was not present on that day, but was in Europe, having left Baltimore on August 30, 1895, and did not return until October 11th, of that year. It undertakes to excuse its ignorance of the fact at the time of the trial, by saying that the suit was not brought until the spring of 1897; that Sahlin had left its employ on or about the first of January, 1897, and it did not discover until May, 1899, that he was not present, after which time it immediately instituted careful inquiries as to the relations between the plaintiff and those three parties, and after a careful and somewhat protracted investigation it ascertained the conspiracy between them. It does not, however, in the motion deny either that Schmidt was incompetent or, if he was, that the defendant knew it. Indeed, it does not in terms deny that Sahlin knew that he was incompetent, but only that he was not present at the time of the accident. If

Sahlin was absent on that day, it may nevertheless be true that he did know that Schmidt was incompetent, as the testimony in the original case showed that he had been previously taken from the cupola because he was not competent, but was put there by Hines on the day of the accident by reason of the temporary absence of the regular man.   But if Sahlin never did know it, and if it is conceded that the testimony of Hines in respect to Sahlin's presence the day of the accident was deliberately false, there is no allegation that the party who took Sahlin's place, in his absence, was not aware of the incompetency of Schmidt. If Sahlin was absent, and no one was in his place, then according to the testimony at the trial, the knowledge of Hines was notice to the company.   He was foreman of that department, employed and discharged the men under him, but was himself under Sahlin when he was there.

There are, of course, cases in which it is not necessary in a motion to strike out a judgment, to show that the defendant has a meritorious case.   If, for example, the ground be that the defendant was never summoned, and he had not appeared by counsel or in person, the Court would have no jurisdiction to enter up the judgment, and the merits of the case would, therefore, not be involved in such motion ; but that is not so in a case of this character.   In many States affidavits of meritorious defenses are required to be filed in seeking to vacate judgments.   15 *Ency. of Pl. and Pr.*, 277, etc.   Whilst there is no statute in this State requiring that, in a case such as this, especially as there has been a trial and the judgment sought to be vacated was obtained after verdict, the Court should not entertain a motion unless it sets up a meritorious defense, and it would not be justified in disturbing the judgment on proof that certain testimony was false and corrupt, without it being shown that the party had in point of fact been injured thereby.   1 *Black on Judgments*, sect. 347.   If Schmidt was in fact incompetent, and notice of it was so brought to the defendant's attention as to bind it, it should not be relieved

of the judgment merely because the particular proof of those facts was false. To adopt such a rule would not be giving judgments that force and effect they are entitled to. The demurrer to the petition to strike out the judgment was therefore properly sustained, if for no other reason, because it does not show that the defendant has a meritorious defense and that the judgment is unjust as it stands.

But the bill in equity does allege what we have just stated should have been in the motion, and as we could, if that was the only difficulty in the way of granting the motion, remand the cause with leave to amend, we will now determine whether the appellant has shown itself to be entitled to relief, regardless of that technical question. We will not stop to discuss the point, raised by the appellee, whether a party can make a motion to strike out a judgment in the Court where it is rendered and at the same time file a bill in equity to have it set aside. There may be cases where the aid of a Court of Equity is necessary to do full justice, although application has been made to strike out the original judgment. Under the peculiar circumstances of this case, where there is a judgment in the Court below, which was affirmed in this Court and then superseded, a Court of Equity could undoubtedly afford more ample relief, if the appellant is entitled to it, than could be obtained in the Court of Common Pleas, especially if it be necessary to enjoin the holders of the judgment from enforcing it, as this bill seeks to do. We will therefore pass on to the consideration of the bill without further reference to that question.

It embodies in substance the allegations mâde in the motion, although it is fuller and corrects the omission we have just spoken of. With it the record in the original case is filed, including the pleadings, testimony and opinion of this Court. The conditions under which Courts of Equity interfere with judgments of Courts of Law in this State, are not usually materially different from those under which the latter act on motions. The party seeking relief

must show that the fraud, or other ground relied on by him, is "unmixed with any fault or negligence in himself." The declaration gave the appellant full and ample notice that the plaintiff relied, for his right to recover, on the neglect of the defendant to employ competent persons, and to provide safe and proper machinery for the work. The first count alleges that it did not exercise ordinary care in the selection of its employees, and the day the trial commenced a second count was added in which it was specifically alleged that some of the employees were unfit for the work of attending to the cupolas; that the defendant knew of their unfitness and incompetency, but continued them in its employ, and the injury to the plaintiff was caused " by the negligence and incompetency of one of said employees and by the improper and unsafe character of the machinery and appliances furnished." It is not pretended that the plaintiff was not seriously and permanently injured, having lost the sight of both eyes, and the defendant was brought into Court to respond in damages for that injury, which could only be recovered on proof of the incompetency of one or more of its employees and the knowledge of the same by the defendant, or proof of its failure to furnish proper and safe machinery and appliances. There was no effort made to establish the latter, and the plaintiff's case depended entirely upon the alleged incompetency of Schmidt and the defendant's knowledge of it. There could, therefore, not have been any surprise when the plaintiff undertook to establish those facts. Thomas J. Doyle, who was foreman of the laborers and riggers at the foundry of the defendant, when the accident happened and when the trial took place, was present and saw the accident. He knew Schmidt, and, at least the day before he testified, he knew that he was working at Carr's foundry in the city of Baltimore. Hines and Johnson were also employed in the same foundry, having afterwards left the defendant's employ. It is no excuse to say that they were no longer in its employ. Schmidt was just as much subject to the process of the

Court out of the defendant's employ as he was in it, yet he was not called as a witness by either party, and so far as the record informs us there was no reason why he could not have been summoned or his whereabouts ascertained in ample time for the trial if there had been ordinary diligence exercised.   It would be difficult to believe that the defendant was so utterly regardless of its own interest, or the welfare of its employees, as not to inquire of some of its employees at the time of the injury, how the accident happened, and Hines was the one it would have been most likely to have made inquiries of, as he was in charge of that part of the work.   If the defendant did not make such inquiries it was by reason of its own neglect, and, if it did make them, it is not pretended that it was misled by what Hines or any one else then said.

But the bill does not even show that the defendant made any effort to ascertain where Sahlin was or to have him at the trial.   It does allege that he left its employ December 31st, 1896, and from that time down to some time in the month of May, 1899, " it had no communication with him and no opportunity to confer with him about this case," but it is not alleged that it made any effort to do so, or to ascertain his whereabouts.   If he was in charge of defendant's works at the time of the accident, ordinary prudence in the preparation of the case for trial would have suggested the importamce of having him present, or at least procuring his testimony, if the defendant intended to deny the incompetency of its employees, or its knowledge of such incompetency.   If he was temporarily absent at the time of the accident, it could have ascertained that fact by seeing or communicating with him, if it did not know it before, and it certainly must, or at least could have known who was in charge of its works when the accident happened.   If no one took Sahlin's place during his absence, then Hines must have occupied such a position as to make notice to him of the incompetency of Schmidt notice to the company, for he employed and discharged the men and had charge of the

work, subject only to Sahlin's higher authority, so far as the record discloses.    If some one took Sahlin's place, then *he* ought to have been procured at the trial if the company proposed to make the defense now set up by it.    But the record of the original case does not show any attempt to deny Schmidt's incompetency or the defendant's knowledge of it, notwithstanding the defendant must have known that the plaintiff's case would depend upon proof of those facts. It is no excuse for the appellant to say that it did not know until May, 1899, that Sahlin was not present, and not until after that time that the testimony of the plaintiff's witnesses was false, for if that be true, it manifestly could only be so by reason of its own neglect and failure to exercise such care in the preparation of the case as was required of it.

Even if it had been taken by surprise at the trial, it could have made some investigation before the motion for a new trial was heard that would have enabled it to ascertain that Sahlin was not present, but it made no effort in that direction and it was only when its president accidentally met him in 1899 it found out what the most ordinary diligence would have enabled it to find out, either before the trial or at least before the hearing of the motion for a new trial.    Such lack of diligence on its part cannot now be rewarded by giving it the aid of a Court of Equity or of the Court where the case was tried, in setting aside a judgment which was obtained by its own neglect, if what it now asserts is correct as to the methods adopted by the plaintiff.    It is not claimed that anything was done by the plaintiff to mislead the defendant or to prevent it from making its defense, and although it alleges that the testimony was false and that the judgment was obtained through the conspiracy of the plaintiff and his three witnesses, and that they were to be compensated for that testimony, the defendant has not shown itself to have so acted as to call for the aid of a Court of Equity or a Court governed by equitable principles.

If the case was to be retried, the questions involved would be precisely the same, so far as the plaintiff is concerned, as

those passed on in the former trial.    It is true the defendant relied on the contributory negligence of the plaintiff—indeed that was its main defense and six out of seven prayers offered by it were on that subject.    That question was disposed of by our decision in 88th Maryland and at a new trial the issues would be whether Schmidt was incompetent and the defendant knew it—the identical questions already passed on by the jury and those which were necessarily involved in determining the plaintiff's right to recover.

The appellant must concede that to be true, but it relies on the allegation that the witnesses for the plaintiff perjured themselves and the verdict was obtained through their false testimony, which was procured by bribery.    In short, the charge is that the witnesses were guilty of perjury and the plaintiff of subornation of perjury and therefore the judgment should be vacated.    Both of those crimes are abhorrent to Courts of justice, and the Legislature of this State has properly provided severe punishment for those convicted of them, but there is perhaps no infamous crime more frequently attributed to others than that of perjury. The losing party to a cause is too frequently ready to attribute his defeat to the false swearing of witnesses, and the frame of mind he. is in, under such circumstances, easily enables him to reach the conclusion that his opponent has procured such false testimony by means of money or other unlawful inducement.    It therefore requires a well-established case to authorize a Court to grant a new trial, on a motion seasonably made, before judgment, on the allegation of a litigant that the testimony on the opposite side was false. And as there is nothing connected with the administration of justice of more importance than having some definite and fixed rules which must bring litigation to an end, Courts have always been reluctant to disturb judgments rendered in the due course of their proceedings, and have for the most part held that the mere fact that a judgment was obtained through the perjury of a witness is not sufficient to justify them in setting it aside.    Our predecessors in *Gott*

v. *Carr*, 6 G. & J. 309, said, in speaking of the testimony
of a witness in a cause instituted to give relief from some
judgments, " if the object be to fix upon him the imputa-
tion of perjury as a ground of relief, it is a purpose, for the
accomplishment of which, chancery will not lend its aid."
In *Smith* v. *Lowry*, 1 Johns. Ch. 320, CHANCELLOR KENT
refused to grant an injunction to stay proceedings at law on
a judgment alleged to have been procured by perjury and
subornation of perjury, after a Court of Law had refused a
new trial.   In *Gray* v. *Barton*, 62 Mich. 197, it was said
that " the weight of authority is directly against the grant-
ing of a new trial in a Court of Equity to impeach the tes-
timony of witnesses or because a party has committed
perjury, or even suborned a witness to commit perjury."
In *Pico* v. *Cohn*, 91 Cal. 129 (s. c., 13 L. R. An. 336), it
was held that perjured testimony procured by bribery on
the part of the successful party is not ground for setting
aside a decree, although there is a reasonable certainty that,
upon proof of the facts alleged, the result of a new trial
would be different.   That case is very similar to this in
many respects, and the opinion of BEATTY, C. J., is so
forcible that we will quote from it at some length, as it
states the reasons for the rule so clearly.   It is there said
" we think it is settled beyond controversy that a decree
will not be vacated merely because it was obtained by forged
documents or perjured testimony.   The reason of this rule
is that there must be an end of litigation ; and when parties
have once submitted a matter, *or have had the opportunity
of submitting it*, for investigation and determination, and
when they have exhausted every means for reviewing such
determination in the same proceeding, it must be regarded
as final and conclusive, unless it can be shown that the jur-
isdiction of the Court has been imposed upon or that the
prevailing party by some extrinsic or collateral fraud has
prevented a fair submission of the controversy."  After
giving illustrations of extrinsic or collateral frauds, it goes
on to say, " in all such instances the unsuccessful party is

really prevented by the fraudulent contrivance of his adversary from having a trial, but when he has a trial he must be prepared to meet and expose perjury then and there. He knows that a false claim or defense can be supported in no other way; that the very object of the trial is, if possible, to ascertain the truth from the conflict of the evidence, and that necessarily the truth or falsity of the testimony must be determined in deciding the issue. The trial is his opportunity for making the truth appear. If, unfortunately, he fails, being overborne by perjured testimony, and if he likewise fails to show the injustice that has been done him, on motion for a new trial, and the judgment is affirmed on appeal, he is without remedy. *The wrong in such a case is, of course, a most grievous one, and no doubt the Legislature and the Courts would be glad to redress it if a rule could be devised that would remedy the evil without producing mischiefs far worse than the evil to be remedied. Endless litigation, in which nothing was ever finally determined, would be worse than occasional miscarriages of justice; and so the rule is that a final judgment cannot be annulled merely because it can be shown to have been based on perjured testimony; for if this could be done once, it could be done again and again, ad infinitum."*

Authorities on both sides are cited in that case and the one most relied on is that of the *United States* v. *Throckmorton*, 98 U. S. 61, which is now a leading case on the subject. A demurrer to a bill to set aside decrees, alleged to have been obtained by fraud, was sustained. JUSTICE MILLER, in giving the opinion of the Court, said: "There are no maxims of the law more firmly established or of more value in the administration of justice, than the two which are designed to prevent repeated litigation between the same parties in regard to the same subject of controversy, namely: *' Interest reipublicæ, ut sit finis litium,'* and *' Nemo debet bis vexari pro una et eadem causa.'*" The Court referred to cases where relief was granted on the ground that by some fraud practiced directly upon the

party seeking relief against a judgment or decree he had been prevented from presenting all his case to the Court, and then said: " On the other hand, the doctrine is equally well settled that the Court will not set aside a judgment because it was founded on a fraudulent instrument, or perjured evidence, or for any matter which was actually presented and considered in the judgment assailed." And after reviewing other cases the Court thus announced its conclusion : " We think these decisions establish the doctrine on which we decide the present case, namely, that the acts for which a Court of Equity will on account of fraud set aside or annul a judgment or decree, between the same parties, rendered by a Court of competent jurisdiction, have relation to frauds extrinsic or collateral to the matter tried by the first Court, *and not to a fraud in the matter on which the decree was rendered. That the mischief of retrying every case in which the judgment or decree rendered on false testimony, given by perjured witnesses, or on contracts or documents whose genuineness or validity was in issue, and which are afterwards ascertained to be forged or fraudulent, would be greater, by reason of the endless nature of the strife than any compensation arising from doing justice in individual cases.*" There are many other cases which are more or less to the same effect, amongst them are *N. Y. C. Ry.* v. *Harrold,* 65 How. Pr. 89; *Ross* v. *Wood,* 70 N. Y. 9; *Camp* v. *Ward,* 69 Ver. 286; *Cotzhausen* v. *Kerting,* 29 Fed. Rep. 21; *Friese* v. *Hummel,* 26 Oregon, 145. There are some to the contrary, but it would unnecessarily prolong this opinion by quoting from them. We would add, however, that the quotation from *United States* v. *Throckmorton, supra,* made by the appellant, that " if there had been a further allegation that Howard was then interested in the Richardson claim, or that Richardson had bribed him, or that for any corrupt motive he had betrayed the interest of the Government, the case would have come within the rule which authorizes relief," does not aid the appellant. The " Howard " spoken of was the " law agent " of the Gov-

ernment, and if he had been bribed it would have brought the case within the rule recognized in all the cases, as under such circumstances there would be no real contest at the trial, as it would be prevented by the fraud of the attorney. The fact that Hines was in the employ of the company when the accident happened, although not at the time of the trial, does not strengthen the appellant's claim for relief, and it cannot be said that the defendant was prevented from making its defense by reason of the false testimony of Hines. He did nothing to mislead the defendant or that in any way interfered with it in making its defense.

The great weight of authority is as stated in the cases of *Pico* v. *Cohn* and *United States* v. *Throckmorton, supra,* and the reasoning of those opinions, especially the portions we have italicised, is so in accord with our views and so satisfactory, we adopt their language instead of attempting to make it clearer by anything we might say why such rule should prevail. Some of the cases concede that a Court of Equity will not interfere simply because some of the witnesses perjured themselves, but hold that it should do so when the successful party was guilty of subornation of perjury. We confess we do not see any valid distinction in the application of the rule. In the first place, witnesses are not apt to commit perjury against the wish of the party calling them and they, as a rule, perhaps do not do so without some expected compensation. It may not be money, but if it is to obtain the favor or the good will of a litigant, although he pays them no money, it is just as reprehensible as if the consideration was a pecuniary one. As was said in *Pico* v. *Cohn,* "the fraud which Cohn committed was the production of perjured evidence in support of his defense. The means by which he induced the witness to swear falsely was but an incident. It may be safely asserted that a witness does not often deliberately perjure himself without being induced thereto by some fraudulent or corrupt practice on the part of him who gets the advantage of the perjury. It is a matter of indifference what

particular form such corrupt practice takes.   The evil and the wrong is in the perjury which follows."

There are some cases which hold that if a witness, whose testimony determined the issue, is afterwards convicted of perjury for such false swearing, relief should be granted, but not otherwise.   There is some reason for that distinction, as it must be on the theory that *quoad* the testimony of that witness his conviction practically settles the question and the danger of continuing the litigation indefinitely or unreasonably no longer exists.   But these parties have not been convicted, and if the case is reopened on testimony produced by the appellant as to that given by Johnson and Hines, the appellees may in turn desire to show that the evidence thus produced was false and procured by unlawful means, and thus the final determination of the litigation might be almost indefinitely postponed.

We are, then, of the opinion that inasmuch as the defendant had ample opportunity to present its defense at the trial on those two questions (the alleged incompetency of Schmidt and the defendant's knowledge of it), which were directly and necessarily involved, and which were actually passed on by the jury, but failed to do so either because they could not be denied or by reason of its own neglect, the judgment cannot now be vacated on the grounds alleged either in the motion or bill in equity, and the rulings of both Courts will be affirmed.

> *Order in No. 40 and decree in No. 41 (Office Docket) affirmed, the appellant to pay the costs in each case.*

(Decided June 15th, 1900.)