ABBOTT v. ÆTNA CASUALTY & SURETY CO. (two cases).

Civ. Nos. 1380, 1350.

District Court, D. Maryland.

Jan. 16, 1942.

George M. Brady, of Baltimore, Md., William C. Sullivan, of Washington, D. C., and Kenneth Lyddane, of Rockville, Md., for plaintiff.

Semmes, Bowen & Semmes and William D. Macmillan, all of Baltimore, Md., and Leonard J. Ganse, of Washington, D. C., for defendant.

· WILLIAM C. COLEMAN, District Judge.

These are two suits on a safe depository liability insurance policy.

The material and undisputed facts as they appear from the pleadings, which will hereinafter be more particularly referred to, are that the plaintiff claims that on August 17, 1936, he placed fifty $1,000 Gold Certificates of the United States for safe keeping in a safe deposit box in the vaults of the Takoma Park Bank, Incorporated, Takoma Park, Maryland, this box having been rented by the plaintiff from this Bank on the same day; and that between November 30, 1937, and December 14, 1937, these Certificates disappeared without the authorization of the plaintiff and without his knowledge until their disappearance was discovered by him on the last mentioned date. Effective for three years commencing August 6, 1937, the Aetna Casualty & Surety Company, the defendant in both of the present suits, issued a safe depository liability insurance policy to the Bank, whereby the defendant agreed "to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay by reason of liability for damages, because of injury to or destruction of or loss of money, securities, jewelry and all other property in the safe deposit boxes in the vault or vaults in the Insured's premises * * *", to the limit of $50,000.

As a result of the alleged unauthorized and unexplained disappearance of these Gold Certificates and also of five $100 United States Treasury Notes, which plaintiff alleged he had also placed in the same safe deposit box in the Bank's vaults and which had likewise disappeared, plaintiff brought suit against the Bank in the Circuit Court for Montgomery County, Maryland, on September 19, 1938, for the value of these Certificates and Notes. This action was removed to the Circuit Court for Charles County, and later to the Circuit Court for Carroll County, Maryland, where jury trial was had and plaintiff recovered a judgment against the Bank in the amount of $50,500. An appeal from this judgment was taken by the Bank to the Court of Appeals of Maryland and on April 9, 1941, the judgment was affirmed. Takoma Park Bank v. Abbott, 179 Md. 249, 19 A. 2d 169. A motion for reargument was overruled. Thereupon, the Bank filed in the Supreme Court of the United States, October term, 1941, petition for a writ of certiorari to review the State Court's action. This petition was denied. 62 S.Ct. 134, 86 L.Ed. ——. Execution was levied upon the judgment so obtained against the defendant and it was returned nulla bona. Thereupon, on July 10, 1941, the plaintiff instituted, on the judgment, an attachment suit against the Aetna Casualty & Surety Company as garnishee, in the Circuit Court for Montgomery County, Maryland. The defendant has duly removed this suit to this Court. The basis of this suit is that the defendant is indebted to the Bank by reason of the liability insurance policy above referred to, for the amount of the judgment. The second of the present suits was filed in this Court on September 17, 1941. It is a direct action against the defendant, the insurance company, on this policy, the basis of this suit being that the plaintiff is the beneficiary entitled to enforce the State Court judgment against the defendant, both by virtue of the express terms of the policy and of Section 68 of Article 48A of the Annotated Code of Maryland which provides that if an execution upon any final judgment against the assured under a liability insurance policy

issued in the State of Maryland is returned unsatisfied, in whole or in part, in an action brought by or on behalf of the injured, an action may be maintained by or on behalf of the injured against the insurance company, under the terms of the policy, for the amount of such judgment, not exceeding the amount of the policy.

Passing now to a consideration of the pleadings in each of the two suits and directing attention first to the direct action on the policy of insurance, the defendant has filed an answer to plaintiff's complaint in this action, embracing four defenses: (1) That the complaint fails to state a claim against defendant upon which relief can be granted; (2) a defense of admissions and denials; (3) that the plaintiff had no property right or interest, legal or equitable, in the fifty $1,000 Gold Certificates which he claims to have lost because he held them in violation of the civil and criminal prohibitions of the so-called Gold Hoarding Act of March 9, 1933, § 2, 12 U.S.C.A. § 95a, and Executive Order No. 6260, Secs. 3, 4 and 5, 12 U.S.C.A. § 95 note, whereby he could and did have no insurable interest in these Certificates, as a result of which he could and did have no insurance coverage or protection under the safe depository insurance policy issued by defendant; and (4) that plaintiff's judgment obtained in the State Court is unenforcible, because obtained by criminal conspiracy and fraud.

The plaintiff has filed a motion to strike parts of this answer under Rule 12(f) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, on the ground that they are "redundant, immaterial, impertinent and scandalous." The same motion also seeks to have the Court strike out the defenses of lack of insurable interest and non-coverage because of the alleged violation of the Gold Hoarding Act and Executive Order No. 6260, and of the alleged criminal conspiracy and fraud in procurement of this judgment.

The plaintiff has also filed another motion for judgment either on the pleadings under Rule 12(c), or for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, relying upon the provisions of the liability insurance policy.

In the second, that is, the attachment suit, the defendant has set up by way of answer, three defenses: (1) Nulla bona; (2) the same denial of property right, title or interest, legal or equitable, on the part of the plaintiff in the Gold Certificates, as alleged in defendant's answer in the direct action; and (3) denial of plaintiff's right to enforce his judgment for the same reasons that a similar denial is made in defendant's answer in the direct action. Plaintiff has filed a motion under Rule 12 (f) to strike defendant's second and third defense as redundant, immaterial, etc. The defendant also sought to take certain deposition testimony in advance of a hearing on plaintiff's motions in the other case, i. e. the direct suit against the defendant insurance company. But plaintiff opposed this, on the ground that defendant was improperly attempting, indirectly, to reopen the State Court judgment. This Court granted a hearing on this point, and sustained the plaintiff, without prejudice, however, to the defendant to petition to be allowed to proceed with the taking of the depositions, should this Court's ruling on plaintiff's motions filed in the other case be favorable to defendant, but not completely conclusive of the issues joined.

It will thus be seen that if the plaintiff has a right to file and to be heard upon its motion for judgment, either on the pleadings under Rule 12(c) or for summary judgment under Rule 56, the primary question in both cases is directly presented for decision by this motion, namely, the construction to be placed upon the liability insurance policy in relation to the judgment obtained by plaintiff against the Bank in the State Court, because, if plaintiff's contentions are sound, then it is entitled to a judgment in the direct suit on the policy, and this will conclude both cases in plaintiff's favor. Likewise, if the plaintiff had no insurable interest under the policy, then there can be no recovery by plaintiff, and this will conclude both suits in favor of defendant.

■ We are satisfied that plaintiff's motion for judgment is proper both as to form and substance, and in relation to the present state of the other pleadings. Neither Rule 7(b) nor Rule 8(c) is violated by relying, as plaintiff does, upon Rule 12(c) and 56 (a). A motion of the present character is to be differentiated, under the Rules, from "a pleading" requiring affirmative defenses to be set forth. To the objection that no grounds are assigned for the motion, it is sufficient for plaintiff to rely, as it does, upon the terms of the policy.

While the pleadings are extensive and varied and disclose a number of different

grounds of defense, properly cognizable under plaintiff's motion for judgment, we will confine ourselves to a consideration of only one of these grounds, because our views with respect to that ground completely dispose of both suits. That ground is that defendant is not estopped by the judgment obtained by the plaintiff against the Bank in the State Court, from denying liability to the plaintiff under its liability policy issued to the Bank, for the amount of that judgment within the policy limits.

■ Is this a meritorious defense? We are of the opinion that it is not for the following reasons. First, the State Court judgment works an estoppel against the defendant since it is conceded that the State Court had jurisdiction, and since the liability policy by its express terms so provides, unless (1) that judgment was procured by fraud of such character as to render it impeachable in the State Court; or unless (2) the plaintiff had no insurable interest under the liability policy here in suit, in the Gold Certificates for the loss of which the judgment was obtained.

■ That, subject to the foregoing qualifications, the estoppel exists is too clear to warrant protracted discussion because the policy by its express terms, recites that the defendant will *"pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay by reason of liability for damages because of* injury to, or destruction of, or *loss of money, securities, jewelry, and all other property in the safe deposit boxes, in the vault or vaults in the Insured's premises* designated in Item I of the declarations, or within that part of such premises occupied by the Insured in conducting a safe deposit business." (Italics inserted.) Furthermore, it is well settled that an indemnitor is, as to the indemnitee, in the absence of fraud or collusion, concluded by a judgment against the latter, where the indemnitor had notice of the litigation and an adequate opportunity to defend the action, even though the indemnitor did not in fact do so, and apart from any agreement making the judgment conclusive. In the present case, the policy—as is customary—expressly provides that the defendant shall be duly notified of any claim covered by the policy, shall take over the defense of any suit based on such claim, and that the Insured shall fully cooperate with the defendant in the defense against any such

suit. All of this was done. Therefore, under Maryland law the judgment became, subject to the qualifications above mentioned, conclusive upon the present defendant. United States Fidelity Co. v. Williams, 148 Md. 289, 129 A. 660.

We now turn to a consideration of the circumstances that may alter this rule, which, as we have seen, are (1) fraud in the procurement of the judgment of such character as to render the judgment impeachable in the State Court; and (2) absence of insurable interest in the subject matter of the judgment.

■ As to the first of these qualifications, namely, the existence of fraud, it is to be noted that it is not any fraud, but fraud of such type as would invalidate the judgment according to the law of the State where the judgment was obtained, because unless the fraud be of this character, the judgment cannot be successfully attacked in a federal court. As was said in Milwaukee County v. M. E. White Co., 296 U.S. 268, at pages 275, 276, 56 S.Ct. 229, 233, 80 L.Ed. 220: "A cause of action on a judgment is different from that upon which the judgment was entered. In a suit upon a money judgment for a civil cause of action, the validity of the claim upon which it was founded is not open to inquiry, whatever its genesis. Regardless of the nature of the right which gave rise to it, the judgment is an obligation to pay money in the nature of a debt upon a specialty. Recovery upon it can be resisted only on the grounds that the court which rendered it was without jurisdiction, Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565; D'Arcy v. Ketchum, 11 How. 165, 13 L.Ed. 648; Tilt v. Kelsey, 207 U.S. 43, 28 S.Ct. 1, [52 L.Ed. 95]; or that it has ceased to be obligatory because of payment or other discharge, Anderson v. Clark, 70 Ga. 362; Haggerty v. Amory, 7 Allen, Mass., 458; First Nat. Bank v. Hahn, 197 Mo.App. 593, 198 S.W. 489; Revere Copper Co. v. Dimock, 90 N.Y. 33, or that it is a cause of action for which the state of the forum has not provided a court, Anglo-American Provision Co. v. Davis Provision Co. [No. 1], 191 U.S. 373, 24 S.Ct. 92, 48 L.Ed. 225; compare Kenney v. Supreme Lodge, 252 U.S. 411, 40 S.Ct. 371, 64 L.Ed. 638, 10 A.L.R. 716, unless it is compelled to do so by the privileges and immunities clause (Const.Amend. 14, § 1); compare Douglas v. New York, N. H. & H. R. Co., 279 U.S. 377, 49 S.Ct. 355, 73 L.Ed. 747; McKnett

v. St. Louis & S. F. Ry. Co., 292 U.S. 230, 54 S.Ct. 690, 78 L.Ed. 1227, and Broderick v. Rosner, supra [294 U.S. 629, 55 S.Ct. 589, 79 L.Ed. 1100, 100 A.L.R. 1133]; or possibly because procured by fraud, compare Christmas v. Russell, 5 Wall. 290, 18 L.Ed. 475; Maxwell v. Stewart, 21 Wall. 71, 22 Wall. 77, 22 L.Ed. 564; Hanley v. Donoghue, 116 U.S. 1, 6 S.Ct. 242, 29 L.Ed. 535; Simmons v. Saul, 138 U.S. 439, 11 S.Ct. 369, 34 L.Ed. 1054, with Webster v. Reid, 11 How. 437, 13 L.Ed. 761; McNitt v. Turner, 16 Wall. 352, 366, 21 L.Ed. 341; Cole v. Cunningham, 133 U.S. 107, 112, 10 S.Ct. 269, 33 L.Ed. 538."

█ This principle, namely, that where a matter has been decided, or the issues were such that it might have been decided, by a State Court of competent jurisdiction, its judgment may be set aside for *extrinsic* or *collateral* fraud, but not for *intrinsic* fraud, is elaborated upon in a much earlier decision of the Supreme Court, United States v. Throckmorton, 98 U.S. 61, pages 64-69, 25 L.Ed. 93, where it was said:

"There is no question of the general doctrine that fraud vitiates the most solemn contracts, documents, and even judgments. There is also no question that many rights originally founded in fraud become—by lapse of time, by the difficulty of proving the fraud, and by the protection which the law throws around rights once established by formal judicial proceedings in tribunals established by law, according to the methods of the law—no longer open to inquiry in the usual and ordinary methods. Of this class are judgments and decrees of a court deciding between parties before the court and subject to its jurisdiction, in a trial which has presented the claims of the parties, and where they have received the consideration of the court.

\* \* \* \* \* \* \*

"But there is an admitted exception to this general rule in cases where, by reason of something done by the successful party to a suit, there was in fact no adversary trial or decision of the issue in the case. Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practised on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side,—these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and a fair hearing.

\* \* \* \* \* \* \*

"In all these cases, and many others which have been examined, relief has been granted, on the ground that, by some fraud practised directly upon the party seeking relief against the judgment or decree, that party has been prevented from presenting all of his case to the court.

"On the other hand, the doctrine is equally well settled that the court will not set aside a judgment because it was founded on a fraudulent instrument, or perjured evidence, or for any matter which was actually presented and considered in the judgment assailed.

\* \* \* \* \* \* \*

"We think these decisions establish the doctrine on which we decide the present case; namely, that the acts for which a court of equity will on account of fraud set aside or annul a judgment or decree, between the same parties, rendered by a court of competent jurisdiction, have relation to frauds, extrinsic or collateral, to the matter tried by the first court, and not to a fraud in the matter on which the decree was rendered.

"That the mischief of retrying every case in which the judgment or decree rendered on false testimony, given by perjured witnesses, or on contracts or documents whose genuineness or validity was in issue, and which are afterwards ascertained to be forged or fraudulent, would be greater, by reason of the endless nature of the strife, than any compensation arising from doing justice in individual cases."

To the same effect are numerous decisions in the lower Federal Courts. In T. J. Moss Tie Co. v. Wabash Ry. Co., 7 Cir., 71 F.2d 107, the appellant appealed to reverse an order of the District Court for the Northern District of Illinois, Eastern Division, which enjoined him from enforcing a judgment which he had obtained in the Superior Court of Cook County, Illinois, against the Wabash Railway Company for personal injuries. This judgment was affirmed by the Illinois Appellate Court which also denied a petition for rehearing. There-

upon, a petition for writ of certiorari was filed in the Illinois Supreme Court, but was denied, and a similar petition filed in the Supreme Court of the United States was likewise denied. In reversing the action of the District Court, the United States Circuit Court of Appeals, Seventh Circuit, said (71 F.2d pages 109, 110):

"In an effort to make this well-established authority [United States v. Throckmorton, supra] inapplicable to appellant's contention, in addition to the allegation that the judgment in the state court was procured through perjury and false swearing, there is the additional charge that there was a conspiracy entered into between appellant, his brother, one Egan, and the witness Lutman, together with an attorney, to have Lutman testify that the rerailers were on the deck of the switch engine. In practically every case of perjury or false swearing discussed in the books, it is quite the rule to find that the alleged false swearing or fraud grows out of a conspiracy to some extent. In United States v. Throckmorton, supra, the statement of fact of the Supreme Court shows that the fraud there practiced, and for which a bill similar to the petition in this case was filed for relief, was in fact predicated upon a conspiracy.

\* \* \* \* \*

"As to the merits as shown by the pleadings. The judgment of Conroy was entered in the superior court of Cook county, an appeal was prosecuted to the Appellate Court and there affirmed, and the holding of that court was absolutely final as to the facts in that case. Applications were made to both the Illinois Supreme Court and the United States Supreme Court for writs of certiorari and denied by those courts. So that the issues between the parties were tried and, upon the judgment entered, every right of the defendant for a review, in that case provided by law, has been exhausted. The judgment is res adjudicata.

"This is an effort to have a federal court of equity set aside the judgment of the state court upon the claim of the discovery of new evidence with which to attack the credibility of the chief witnesses in the original trial. This additional evidence, if offered at the trial and if true, would simply have added to the evidence originally considered by the jury in determining the credibility of appellant, plaintiff in the original suit, and his chief witness, Lutman. Even though the receivers could successfully maintain the allegations of their intervening petition, they are not entitled to the relief prayed.

"The motion to dismiss the intervening petition should have been allowed, and the motion by the surety company for the preliminary injunction against the prosecution of appellant's suit to recover on the appeal bond should not have been granted."

In Warrington v. Ball, 3 Cir., 90 F. 464, and Ball v. Warrington, 3 Cir., 108 F. 472, the suit was against a stockholder in a Kansas corporation, based upon a judgment which had been obtained in the Kansas courts against the corporation. It was held by the Circuit Court of Appeals for the Third Circuit that such judgment could be impeached in the stockholder's suit, for fraud and collusion, but not otherwise, because the Supreme Court of Kansas had so held in a similar case.

In the present case the fraud alleged is that the plaintiff and likewise his alleged donors of the Gold Certificates—two of his aunts who died before the State suit was commenced—never owned or possessed these Certificates, but that on the contrary the plaintiff's claim for loss of these Certificates is fraudulent and without foundation in fact, and is a conspiracy between him and certain witnesses who testified on his behalf to defraud the Takoma Park Bank and the present defendant. In short, defendant claims that the State court judgment was obtained as a result of perjured testimony given by and on behalf of plaintiff.

Let us see, then, whether under the Maryland rule such perjury and collusion is sufficient to render the judgment impeachable. By the decision in Maryland Steel Co. v. Marney, 91 Md. 360, 46 A. 1077, and Wilmer v. Placide, 127 Md. 339, 96 A. 621, it is well settled that a retrial cannot be had by charging that a judgment has been procured by perjury.

In the first of these cases it was held that the execution of a judgment obtained for personal injuries could not be restrained on the ground that the judgment had been recovered by means of perjured testimony and that plaintiff had promised compensation to certain witnesses to induce them to give false evidence. The Maryland Court of Appeals said (pages 372, 373 of 91 Md., page 1080 of 46 A.):

"It is not claimed that anything was done by the plaintiff to mislead the defendant,

or to prevent it from making its defense; and although it alleges that the testimony was false, and that the judgment was obtained through the conspiracy of the plaintiff and his three witnesses, and that they were to be compensated for that testimony, the defendant has not shown itself to have so acted as to call for the aid of a court of equity, or a court governed by equitable principles.

"If the case were to be retried, the questions involved would be precisely the same, so far as the plaintiff is concerned, as those passed on in the former trial.

\* \* \* \* \*

"The losing party to a cause is too frequently ready to attribute his defeat to the false swearing of witnesses; and the frame of mind he is in, under such circumstances, easily enables him to reach the conclusion that his opponent has procured such false testimony by means of money or other unlawful inducement. It therefore requires a well-established case to authorize a court to grant a new trial, on a motion seasonably made, before judgment, on the allegation of a litigant that the testimony on the opposite side was false. And as there is nothing connected with the administration of justice of more importance than having some definite and fixed rules which must bring litigation to an end, courts have always been reluctant to disturb judgments rendered in the due course of their proceedings, and have for the most part held that the mere fact that a judgment was obtained through the perjury of a witness is not sufficient to justify them in setting it aside."

The later case of Wilmer v. Placide, 127 Md. 339, 96 A. 621, is to the same effect. There the Court said (pages 340-342 of 127 Md., page 622 of 96 A.) : "As to the allegation that the decree now sought to be set aside was obtained by perjured testimony, in the view of this court it falls directly under the rule as laid down in the case of Maryland Steel Co. v. Marney, 91 Md. 360, 46 A. 1077.

\* \* \* \* \*

"Instances of the fraud for which the reopening of a case will be granted are: Keeping the opposing party away from the court; a false offer of compromise; where a defendant never had any knowledge of the suit, as in the Foxwell case [Foxwell v. Foxwell], 122 Md. 263, 89 A. 494; or where an attorney without authority assumes to represent a party."

It is urged upon us in the present case that there was more than perjury in obtaining the State Court judgment, that there was collusion practised for the purpose of defrauding the Bank and the present defendant. Does this alter the situation? We are satisfied that it does not according to the Maryland rule, or by the weight of authority in other jurisdictions. The rule which must guide us in the present case is well summarized in Freeman on Judgments, Fifth Edition, as follows (pages 662-664) :

"The cases recognizing fraud or collusion as matter for impeachment of the judgment either concern attacks made thereon by creditors or third persons, a matter elsewhere considered, or else involve fraud of a character going to the very jurisdiction of the court preventing it from obtaining the requisite power to entertain or decide the issues in controversy. There can be no question as to the vitiating effect of fraud of this latter description or of what has been termed fraud upon the court. It invalidates the judgment because it precludes the acquisition of that power or jurisdiction without which, we shall see, a judicial determination is a mere nullity. Where therefore by reason of the fraud the apparent trial is in reality not one of adversary rights in a proper subject matter, the judgment would for that reason be impeachable collaterally. Thus where because of the fraud practiced the adverse party was not served with notice or process or was prevented from having a hearing, the judgment against him would ordinarily be a nullity. And hence a child may in an action for wrongful death show that a judgment pleaded in bar was obtained by fraud, in that the former suit was filed and judgment obtained without the knowledge of the plaintiff in the former suit or the parties in interest, and that no trial was had and that no one authorized to sue had any knowledge of the suit or the judgment.

"Quite different from such inceptional or jurisdictional fraud which destroys the judgment by reason of the fact that it defeats the jurisdiction upon which the judgment must rest is fraud inhering in the proceeding itself. This latter species of fraud is not ordinarily available as a ground for collateral attack, at least to the parties themselves or their privies. A party to a judgment feeling himself aggrieved thereby may, in a proper case, either move that it be vacated, or prosecute an appeal or writ

of error, or maintain a suit in equity to enjoin its enforcement. These, unless the judgment is void on its face, are the only remedies open to him, and if he resorts to neither, or resorting to any or all he is denied relief, he cannot avoid the judgment, when offered in evidence against him, by proving that it ought not to have been pronounced and was procured by fraud, mistake, perjury or collusion, or through some agreement entered into by the prevailing party, and which he neglected or refused to perform."

The Insurance Company lays great stress upon the case of Chicago, Rock Island & Pacific Ry. v. Callicotte, 267 F. 799, a decision of the Circuit Court of Appeals of the Eighth Circuit, certiorari denied 255 U.S. 570, 41 S.Ct. 375, 65 L.Ed. 791, 16 A. L.R. 386. This was a suit to set aside, on the ground of fraud, a judgment for personal injuries obtained by Callicotte against the railway company in a Missouri State Court. At the time of the trial in the Federal District Court, appeals were pending in the Supreme Court of Missouri from this judgment. The lower Federal Court dismissed the railroad company's bill for equitable relief, but was reversed on appeal. Prior to the Circuit Court of Appeals' decision, the Supreme Court of Missouri affirmed the lower State Court judgment, but for procedural reasons declined to pass upon the fraud question.

It is believed that the character and extent of the fraud which the Circuit Court of Appeals, in the Callicotte case, found sufficient to warrant relief from enforcement of the judgment, is sufficiently set forth in the following quotation from that Court's opinion and we further feel that it will become immediately apparent from what is quoted, that the character and extent of this fraud was entirely different from that presented in the present case. The Court said (pages 802, and 809, 810 of 267 F.) :

"We have here, therefore, a conspiracy by Callicotte and others (1) to prevent his true condition and the history of his case being known; (2) to swear falsely as to his condition and the history of his case; (3) to produce a false condition and fabricate a false history of the case as a basis for testimony by witnesses other than himself. This conspiracy was directed against the defendant, the defendant's witnesses, and certain of the plaintiff's own witnesses, and against the court, and jury.

Its purpose was not merely to present a false case for plaintiff, but also to prevent the defendant company from putting in its own case in defense.

\* \* \* \* \* \*

"The facts in the case at bar have been already stated, and the question arises wherein lay the fraud. Was it simply in the false testimony at the time of the trial that plaintiff was permanently paralyzed? By no means. The fraud consisted also in a concocted history of the case, to wit, that plaintiff a few days after the accident became paralyzed, and remained so continuously thereafter up to the time of the trial, a period of more than six months. The continuance of the paralysis for a period of more than six months was one of the most important factors on which all of the medical men, both for the plaintiff and defendant, based their conclusions. We may disregard the question whether at the several times of the examinations of plaintiff he was artificially paralyzed by drugs or feigned paralysis through self-control. We may even assume that he had true paralysis on these several occasions if possible, but the fact remains that in the intervals he had the use of his legs, and had been seen and known to use them on many occasions. Yet this true history of the case was, by a conspiracy, concealed from the defendant; the false history of the case was given to the various doctors for the defendant, and even to one of the plaintiff's own doctors, either by the plaintiff himself or by another of his doctors. On this false and fraudulent foundation these medical experts rested their conclusions. In other words, they were induced by trickery to testify directly opposite to what they would undoubtedly have testified had they known the truth. *The jury was deceived; the court was deceived; the witnesses many of them were deceived—all by this conspiracy and fraud, a fraud consisting not merely in the testimony of plaintiff on the trial, but also in this concocted plan outside of court, pursuant to which a false history of the case was made up and proclaimed. By this fraud the witnesses for defendant, and one at least of the witnesses for the plaintiff, were led to give entirely different testimony from what they would have given but for this fraud. The examination tests on the plaintiff himself and the history of the case were the two main factors on which the experts rested their conclusions. Had these experts been caused to make tests on a real paralytic fraudulently substituted in place*

*of plaintiff, no one would hesitate to say that the fraud was extrinsic and collateral; yet to substitute a false history of the case in place of the true one, by deception and conspiracy, was equally an extrinsic and collateral fraud, and did 'not merely consist in false and fraudulent documents or testimony submitted to the tribunal and the truth of which was contested before it and passed upon by it,' as the rule was stated in the case of Hilton v. Guyot, supra [159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95]. In our judgment the facts take the case out of the rule announced in the Throckmorton case and restated in the Hilton case."* (Italics inserted.)

It will be seen from the aforegoing that the judgment in the Callicotte case was set aside, not for intrinsic, but for extrinsic, fraud. But there is this further and very important difference between the Callicotte case and the present suit—in the former, the fraud was of such extreme and extrinsic character as presumably would have impelled the Supreme Court of Missouri to set the judgment aside, had the question of equitable relief been presented to it in such manner that it could have considered it. In short, as is stated in the opinion of the Circuit Court of Appeals (page 810 of 267 F.), "the merits of the company's application for relief have not been passed upon in the State courts." On the other hand, as respects the Maryland judgment in the present suit, the full gamut of the Maryland State Courts has not only been run, but the type of alleged fraud is so distinctly different from that pleaded and proved in the Callicotte case, that there is no authority under Maryland or Federal Court decisions for impeaching the judgment now under review.

 As was said by the Supreme Court in Toledo Co. v. Computing Co., 261 U.S. 399, 421, 43 S.Ct. 458, 464, 67 L.Ed. 719: "There has been much discussion as to whether extrinsic fraud is here alleged, and the case of United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93, is cited and numerous other authorities since that case. We do not find ourselves obliged to enter upon a consideration of the sometimes nice distinctions made between intrinsic and extrinsic frauds in the application of the rule, because in any case to justify setting aside a decree for fraud whether extrinsic or intrinsic, it must appear that the fraud charged really prevented the party complaining from making a full and fair defense. If it does not so appear, then proof

of the ultimate fact, to wit, that the decree was obtained by fraud fails. That is the case here." See also Fidelity Storage Co. v. Urice, 56 App.D.C. 202, 12 F.2d 143, a decision of the Court of Appeals of the District of Columbia, where the principle is very clearly elucidated, in connection with a situation similar to the one here presented.

Finally, on this point, it is clear that when stripped of technical argument and questions of procedure, the real basis of the alleged conspiracy between the plaintiff and certain witnesses, who testified on his behalf in the State Court trial, to defraud the Bank and the present defendant, is that the plaintiff never possessed or placed the Gold Certificates in the safe deposit box in the Bank, and this was the very issue before the State Court. In short, what the present defendant obviously is seeking is a new trial of the same issues in this Court, in the hope that it will be possible to present a different, and therefore stronger, array of evidence on the Bank's behalf.

 We now turn to a consideration of whether the second circumstance existed which would prevent the State Court judgment from working an estoppel against the present defendant, namely, whether plaintiff lacked an insurable interest under the policy in suit in the Gold Certificates, for the loss of which the State Court judgment was obtained. More specifically, defendant contends that plaintiff had no property right in the Gold Certificates because the Gold Hoarding Act and Executive Order No. 6260 had removed from these Certificates the status of property when held contrary to the requirements of this Act and Executive Order and made them contraband; that therefore, the plaintiff had no insurable interest in these Certificates and that regardless of the language of the safe depository policy issued to the Bank, the plaintiff could, therefore, have no insurable coverage under that policy.

The assertion of this defense is tantamount to saying that in the State Court proceeding there was no adjudication of the status of these Certificates. That is to say, that there was no adjudication as to whether they were or were not property. But we cannot accept this construction of the State Court's decision. Let us see what was actually decided. This is to be found in the following part of the opinion rendered by Judge Collins (19 A.2d 169, at pages 173 to 174):

"This court decided in the case of Security Storage & Trust Company v. Martin, 144 Md. 536, 125 A. 449, that the relation existing between the lessor and lessee of a safe deposit box is that of bailor and bailee, and further that failure to deliver and account for the contents of the safe deposit box should be treated as prima facie evidence of the negligence of the defendant in not exercising ordinary or reasonable care and diligence in the safe keeping of the contents of the box. We feel that the facts in the instant case are sufficiently similar to those in the case of Security Storage & Trust Company v. Martin, supra, as to make the same rulings applicable and as the plaintiff's prayers as amended, are substantially the same as in that case, the ruling of the court on those prayers was correct. The defendant's fourth and fifth prayers were substantially the same as the second and fourth prayers of the defendant in the case of Security Storage & Trust Company v. Martin, supra, and under the decision of this court in that case, were properly refused. The defendant's B prayer was the usual demurrer prayer and for the same reason we agree with the ruling of the trial court on that prayer. The defendant's C prayer we will discuss later in this case.

"The defendant filed two pleas, the first plea being the general issue plea. The second plea was a special plea reciting that plaintiff had no interest, legal or equitable in the fifty $1,000 gold certificates of the United States of America because he held them in violation of Section 5 (b) of the Act of Congress of October 6, 1917, as amended by Section 2 of the Act of Congress of March 9, 1933, 50 U.S.C.A. Appendix, § 5, [12 U.S.C.A. § 95a] and the Executive Order No. 6260, § 5, 12 U.S.C.A. § 95 note, dated August 28, 1933, and is not legally entitled to maintain his action to recover damages, interest, and profits for the alleged loss thereof. To this second plea the plaintiff demurred and the demurrer was sustained.

"Was the court correct in sustaining this demurrer? Section 5 of the Executive Order No. 6260 above referred to provides that after thirty days from August 28, 1933, no person shall hold or retain any interest, legal or equitable, in any gold coin, gold bullion, or gold certificates situated in the United States and owned by any person subject to the jurisdiction of the United States, except under license therefor issued pursuant to this Executive Order. The

special plea did not state that the plaintiff did not have a license. 'To constitute a good plea in bar, the matter pleaded, must, if true, afford a full and complete answer to the action and show that there is no right of recovery.' Glenn v. Williams, 60 Md. 93; Carroll v. Bowen, 113 Md. 150, at page 154, 77 A. 128. Section 3 of the Act of March 9, 1933, supra, 12 U.S.C.A. § 248 (n), also directs that the Secretary of the Treasury shall pay therefor an equivalent amount of any other form of coin or currency issued under the laws of the United States, and although the gold certificates in this case were held after thirty days from August 28, 1933, in order for confiscation to take place, it appears that intent to violate the act must be shown. United States v. 98 $20 United States Gold Coins et al., D.C.E.D.Pa., August 17, 1937, 20 F.Supp. 354. The case of Schmidt v. Twin City State Bank, April 6, 1940, 151 Kan. 667, 100 P.2d 652, 653, is cited by the appellant, but in that case, at the conclusion of the plaintiff's case the defendant filed a motion to strike from the record all evidence concerning gold coins. Further, the special plea does not answer the whole declaration because there is no defense set up therein to the loss of $500 in currency. Mitchell v. Sellman, 5 Md. 376. Unless the plea expressly states that it is intended only as an answer to a part, it will be taken as extending to the whole, and will necessarily then be held bad on demurrer, unless it presents a good defense to the whole. Poe on Pleading, Tiffany Edition, Sec. 664. *We must also note that as above stated, based on the ruling in the case of Security Storage & Trust Company v. Martin, supra, the relation of bailor and bailee existed and that a bailee cannot dispute the bailor's title.* Van Zile, Bailments & Carriers, 2nd Ed., 1908 Sec. 20, pp. 17, 18. We, therefore, concur with the trial court in sustaining this demurrer to the second plea. The demurrer to the second plea having been sustained, the defendant's C prayer based on the second plea was properly rejected." (Italics inserted.)

It thus is beyond question that the Maryland Court of Appeals held that the plaintiff had title to these Certificates which the Bank could not dispute and it was upon the recognition of this fact that the Court gave judgment for the plaintiff. It would be idle to labor this point further. The language of the Court's opinion is clear and succinct. The Bank unquestionably admitted this fact and relied upon it in its

petition to the Supreme Court of the United States for a petition for a writ of certiorari to the Court of Appeals of Maryland and in presenting that petition, the Bank was represented by the same counsel, among others, who represent the defendant insurance company in the present proceeding. In that petition, we find it stated that "Petitioner has contended throughout this proceeding that respondent has no property right in the Gold Certificates, either legal or equitable, which a court may recognize consistent with Executive Order No. 6260, supra." In enumerating the questions presented, four in number, the petition includes the following: "1. Whether one who held Gold Certificates after thirty days from August 28, 1933, retained any interest, legal or equitable, therein, so that he could maintain an action for them;" and "4. Whether a holding that a bailee of Gold Certificates is estopped to deny that the bailor had any interest, legal or equitable therein, under the Gold Hoarding laws, is consistent with the policy of those laws." Further, in its specification of errors in the action of the Court of Appeals of Maryland, the following are enumerated: "1. The court erred in holding that respondent retained any interest in Gold Certificates, which would support an action or judgment therefor against petitioner;" and "4. The court erred in holding that petitioner could not dispute the title of respondent in Gold Certificates."

In the face of the aforegoing, defendant would, nevertheless, have us say that the plaintiff has no insurable interest in these Gold Certificates under the policy in suit. In short, the defendant would have us say this in spite of the fact that the highest court of Maryland has rendered a judgment which cannot now be impeached and which is based upon that court's decision that the present plaintiff had such interest in these Gold Certificates as to entitle it to recover their value from the Bank; and in spite of the fact that the policy here in suit expressly declares that the present defendant shall "pay on behalf of the Insured [the Bank] all sums which the Insured shall become legally obligated to pay by reason of liability for damages because of * * * loss of money, securities, jewelry, and all other property in the safe deposit boxes in the vault or vaults in the Insured's premises * * *" among which boxes was the box in which these Gold Certificates were found by the Court of Appeals of Maryland to have been deposited and from which they were found to have disappeared. We feel that the mere statement of this proposition is sufficient to refute it. The policy further recites that the Insured's obligation to pay arises when that obligation "shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant, and the Company, "and not in either event unless suit is instituted within two years and one day after the date of such judgment or written agreement." And "Any person or his legal representative who has secured such judgment or written agreement shall thereafter be entitled to recover under the terms of this policy in the same manner and to the same extent as the Insured." We, therefore, do not see how it could be made any clearer that plaintiff is entitled to recover on the policy unless we torture the very language of the policy and declare that it does not mean what it says.

Defendant places great reliance upon the case of Schmidt v. Twin City State Bank, 151 Kan. 667, 100 P.2d 652, 656, a quite recent decision by the Supreme Court of Kansas, where it was held in an action for damages by a renter of a safe deposit box against a bank that had rented him the box, that the renter had no title or interest in gold coins alleged to have disappeared from the box, since all title and interest had been forfeited to the United States by reason of the Gold Hoarding Act § 2, 12 U.S.C.A. § 95a, and Executive Order No. 6260, 12 U.S.C.A. § 95 note, relied upon in the present suit.

While one of the grounds upon which the court affirmed the lower court's judgment in favor of the defendant was that there was no proof of negligence on defendant's part constituting the proximate cause of the alleged loss of the gold coins, it also directly affirmed a finding of the lower court to the effect that defendant's motion to strike the evidence pertaining to the gold coins was properly sustained because plaintiff had no title or interest in them. So we may properly treat this Kansas decision as being directly contrary to the decision of the Maryland Court of Appeals in the present plaintiff's suit against the bank, although there is scant discussion of this point in the Kansas case, the conclusion being rested squarely upon the effect of the Gold Hoarding Act and the Executive Order, without deciding the precise legal relationship between the parties—

that is, whether it was that of bailor and bailee, or lessor and lessee. The court held that: "Assuming the relation of the parties was that of bailor and bailee, as contended by plaintiff, defendant's duty was to exercise ordinary care and diligence, that is, such care and diligence as a reasonably prudent person or corporation would exercise under like circumstances in safeguarding the contents of the box," and found that defendant had met this requirement.

The fact that the law of Kansas, as defined in the Schmidt case, just analyzed, is contrary to the law of Maryland as defined in the decision of the Maryland Court of Appeals in the suit brought by the present plaintiff against the Bank, is no warrant for following the Kansas law in the present proceeding, because even assuming, but without deciding, that the Kansas Court's treatment of the effect of the Gold Hoarding Act and the Executive Order upon private holding of gold coin or certificates in contravention thereof, is the more convincing, such proves nothing with respect to the present proceeding, because in it we must give full faith and credit to the judgment of the Maryland Court of Appeals. That is to say, the question of the Bank's liability is not open to review by this Court, and we cannot treat it as though it were. Therefore, the sole question left for decision by us is whether the Bank's liability is a liability of the defendant insurance company, by virtue of the policy which it issued to the Bank.

The policy is to be construed according to the law of the place where it was executed. Such place is the place where the last act necessary to complete the contract of insurance, as evidenced by the policy, was performed. The policy recites that it has been "signed by its the company's President and a Secretary at Hartford, Connecticut, and countersigned by a duly authorized agent of the company." It appears that the counter-signature was placed on the policy by the manager of the Company's branch office in Washington, D. C., and that thereafter the policy was forwarded to the bank, at Takoma Park, Maryland, where it was accepted. Thus this acceptance by the bank was the last act necessary to complete the contract of insurance, and since it was performed in Maryland, Maryland law governs.

We have not been referred to, nor have we found, any Maryland decision or indeed any decision of any jurisdiction, State or Federal, which even suggests that recovery is to be denied upon a safe depository liability policy, reading as does the one in suit, to a person such as the present plaintiff, who bases his right to recover upon an unimpeachable judgment which he has obtained against the insured on account of loss of the contents of a safe deposit box covered by the policy.

But, says the defendant, it is an implied and necessary condition of every contract of insurance, to be read into its terms and conditions, that the insurance must be limited to a lawful subject matter; that it can only be written in respect of things having a lawful status as property, and may never be used to protect or insure the possession of anything which law or public policy has deprived of the status of property. In support of its argument, defendant says that, assuming that the Bank had actually known of the existence of the Gold Certificates in the plaintiff's safe deposit box, it could not have lawfully procured, and the defendant company could not lawfully have issued to it, insurance protecting them; and that therefore, the plaintiff can stand in no better position than the bank because the claims of both would stem from the same illegal transaction. Defendant relies upon such decisions as Board of Police Commissioners v. Wagner, 93 Md. 182, 48 A. 455, 52 L.R.A. 775, 86 Am.St.Rep. 423, where the right of replevin was denied to one seeking to recover a slot machine used for gambling purposes; Burgess v. State, 161 Md. 162, 155 A. 153, 75 A.L.R. 1471 where although a criminal conviction was upheld for larceny of liquor which was possessed in violation of the National Prohibition Act, 27 U.S.C.A. § 1 et seq., it was recognized that no civil right existed for conversion of the liquor; Northwest Amusement Co. v. Ætna Casualty & Surety Co., 165 Or. 284, 107 P.2d 110, 132 A.L.R. 118 where recovery was denied upon a policy of insurance against theft of personal property, for stolen slot machines possessed in violation of a city ordinance; Gonch v. Republic Storage Co., Inc., 245 N.Y. 272, 157 N.E. 136, and Orient Ins. Co. v. Ariasi, 9 Cir., 28 F.2d 579 where recovery was denied for loss of whiskey possessed in violation of the National Prohibition Act, since that Act declared that no property rights shall exist in any such liquor.

We do not question the correctness of any of these decisions, but deny that they have any conclusive value with respect to

806

the precise question in controversy because the Maryland Court of Appeals has placed Gold Certificates in a different category by directly adjudicating that they may be the basis of a suit for the recovery of their value.

It is easy to cloud the real issue in the present case by going into a discussion of the refinements of what is "an insurable interest". If the language of the policy itself did not clearly define the insurance company's liability, the question presented might not be so simple. However, the policy is free from ambiguity and we have merely to determine what is the sensible interpretation to be placed upon the language which we have already quoted. That is to say what is "the Insured's obligation" that had been "finally determined" by the judgment? What is the Insured's legal liability? Beyond any question it is the liability to pay for the loss of the Gold Certificates. As was said in Royal Insurance Co., Ltd., v. St. Louis-San Francisco Ry. Co., 291 F. 358, page 361, a decision of the Circuit Court of Appeals for the Eighth Circuit: "As we understand the term 'legal liability,' in such contracts as is involved in this action, it is a liability which our courts of justice in this country recognize and enforce as between parties litigant therein. The very question put in issue, tried and determined in the action in the state court, was the 'legal liability' of the carrier to the owner of the cotton. If there existed no legal liability of the carrier to the owner for the loss of the cotton by fire, it followed as a necessary sequence the insurance company is maintained liable for nothing, unless it should be for the expense of the carrier in making the defense. On the contrary, and as a necessary corollary to the foregoing proposition, if courts of full, complete jurisdiction determine on a trial such 'legal liability' did exist, this determination controls, regardless of the fact that it may be now insisted the determination made was wrong or erroneous in legal principle or unjust in conclusion; for a court possessing jurisdiction over the subject-matter of a cause and the parties thereto possesses the same power to reach a wrong or erroneous conclusion as to the law of a case, and make it binding upon the parties thereto until revised and reversed for error, as it does to enter a correct or right judgment or decree and bind the parties thereby." See also B.

Roth Tool Co. v. New Amsterdam Casualty Co., 8 Cir., 161 F. 709; and Globe Indemnity Co. of New York v. Banner Grain Co., 8 Cir., 90 F.2d 774.

An analogy of value is to be found in decisions construing rights under automobile insurance policies where they are sued upon as a result of judgments that have been obtained for personal injuries. However, many such cases are not to be confused with or treated as controlling upon, the facts in the present case because such cases turn upon express refinements contained in the policies, defining when liability shall arise. As an example of this type of case see State Farm Insurance Co. v. Coughran, 303 U.S. 485, 58 S.Ct. 670, 82 L.Ed. 970. Compare Miller v. United States F. & G. Co., 291 Mass. 445, 197 N.E. 75.

In view of the interpretation which we place upon the policy, it is irrelevant to speculate as to whether, if the Gold Certificates had not disappeared, upon the Government learning of plaintiff's possession of them, they would have been confiscated, because plaintiff's right of recovery against the insurance company in the present suit is a right acquired directly by virtue of the State Court judgment, and since that judgment cannot be impeached, plaintiff's right cannot otherwise be taken away.

Likewise, it follows as a result of the conclusions here reached that it becomes unnecessary to, and we therefore will not, pass upon the question whether plaintiff is entitled to enforce the State Court judgment against the defendant by virtue of the express terms of Section 68 of Article 48A, of the Annotated Code of Maryland, as well as by virtue of the express terms of the policy.

In conclusion, therefore, we find that plaintiff's motion for judgment in the direct suit on the policy must be granted for $50,000 (excluding the additional $500 of the State Court judgment because the limit of liability under the policy is $50,000), with interest thereon from the date of judgment in the lower State Court. Until the period within which an appeal can be taken has expired; or, if an appeal is taken, then until the appellate court has rendered its decision, it appears that no action need be, and therefore none will be, taken in the other, namely, the attachment suit.